No. 23-1769

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

CHRISTIAN HEALTHCARE CENTERS, INC.,

*Plaintiff-Appellant,*

v.

DANA NESSEL; JOHN E. JOHNSON, JR.; PORTIA L. ROBERSON; ZENNA FARAJ ELHASON; GLORIA E. LARA; REGINA GASCO-BENTLEY; ANUPAMA KOSARAJU; RICHARD CORRIVEAU; DAVID WORTHAMS, in their official capacities as members of the Michigan Civil Rights Commission,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:22-cv-00787

---

## OPENING BRIEF OF APPELLANT
## CHRISTIAN HEALTHCARE CENTERS, INC.

---

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jonathan A. Scruggs
Bryan D. Neihart
Henry W. Frampton, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org
hframpton@ADFlegal.org

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1 and Sixth Circuit R. 26.1(a), Appellant Christian Healthcare Centers, Inc., states that it has no parent corporation, does not issue stock, is not a subsidiary or an affiliate of a publicly owned corporation, and there is no publicly owned corporation or its affiliate, not a party to this appeal, that has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................. i

Table of Authorities ............................................................. vi

Statement in Support of Oral Argument ................................... 1

Statement of Jurisdiction ...................................................... 2

Statement of Issues ............................................................. 3

Introduction ...................................................................... 4

Statement of the Case .......................................................... 6

I.  Christian Healthcare provides attentive medical care based
    on its religious calling to look after those in need. ........................ 6

II. Michigan's laws affect Christian Healthcare. ................................ 8

    A.  The Accommodation Clause. ................................................. 8

    B.  The Employment Clause. ...................................................... 9

    C.  The Publication Clause. ....................................................... 10

III. Michigan's laws are easy to enforce and impose severe
     penalties that would ruin Christian Healthcare. .......................... 10

IV.  Michigan expands ELCRA through an unlawful
     Interpretative Statement, litigation, and legislation and
     rejects proposed religious exemptions. ..................................... 12

V.   Michigan actively enforces its laws against other faith-based
     organizations and businesses. ............................................... 14

VI.  Other jurisdictions say—and Michigan agrees—that it is
     unlawful to refuse to use a person's chosen pronouns or to
     decline medical procedures to facilitate gender transitions. ........ 17

VII.   Christian Healthcare learns that Michigan prosecutes faith-based businesses, then self-censors and refrains from activities to avoid prosecution.............................................17

VIII.  The district court dismisses Christian Healthcare's lawsuit even though Michigan refused to disavow and actively prosecutes other religious organizations. ......................19

Standard of Review ..............................................................22

Summary of the Argument ...................................................23

Argument.............................................................................24

I.    Christian Healthcare has standing and its claims are ripe...........24

      A.   Christian Healthcare has standing because Michigan's laws credibly threaten and chill its activities. ....................25

           1.   Christian Healthcare intends to and engages in activities protected by the First Amendment..............25

           2.   Michigan's laws arguably prohibit Christian Healthcare's desired activities....................................25

           3.   Christian Healthcare deserves a presumption that it faces a credible enforcement threat. ...............31

           4.   Although unnecessary for Christian Healthcare's standing, other factors support its credible threat of enforcement. ............................................35

      B.   Christian Healthcare's claims are ripe on this comprehensive record...........................................41

      C.   The district court incorrectly invoked hypothetical exemptions to reject Christian Healthcare's standing.........43

           1.   The district court forces Christian Healthcare to hope Michigan allows it to exercise its constitutional rights....................................44

      2.    The district court's analysis requires Christian Healthcare to go through a BFOQ process that violates its constitutional rights and is futile. ............ 48

II.   Christian Healthcare is entitled to a preliminary injunction because it is likely to succeed on the merits. ................................ 52

    A.   The Accommodation Clause compels Christian Healthcare to convey a message about gender-identity it disagrees with through pronouns. ...................................... 53

    B.   The Publication Clause censors Christian Healthcare's religiously motivated speech based on content and viewpoint. ................................................................. 54

    C.   Michigan's laws violate Christian Healthcare's religious autonomy by dictating employment decisions and controversial medical procedures. ................................ 56

       1.    Michigan's laws violate Christian Healthcare's religious autonomy by forcing it to hire ministerial employees who don't share its faith. ........ 57

       2.    Michigan's laws interfere with Christian Healthcare's religious autonomy by dictating non-ministerial employee decisions. ................................... 59

       3.    Michigan's laws violate Christian Healthcare's religious autonomy by forcing it to provide medical treatment contrary to its beliefs. ................... 61

    D.   The Employment Clause lacks general applicability and violates Christian Healthcare's free exercise. ............... 62

    E.   Michigan's laws fail strict scrutiny. ...................................... 63

Conclusion ........................................................................ 64

Certificate of Compliance ....................................................... 66

Certificate of Service ........................................................... 67

Addendum .................................................................................68

# TABLE OF AUTHORITIES

## <u>Cases</u>

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ........................................................... 33, 56, 57

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ................................................................... 67

*Bays v. City of Fairborn,*
    668 F.3d 814 (6th Cir. 2012) ...................................................... 56

*Block v. Canepa,*
    74 F.4th 400 (6th Cir. 2023) .................................................. 39, 40

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) .................................................................. 9

*Bouye v. Bruce,*
    61 F.4th 485 (6th Cir. 2023) ....................................................... 24

*Braidwood Management, Inc. v. EEOC,*
    70 F.4th 914 (5th Cir. 2023) ....................................................... 48

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ................................................................... 67

*Chrisman v. Sisters of St. Joseph of Peace,*
    506 F.2d 308 (9th Cir. 1974) ...................................................... 65

*City of Lakewood v. Plain Dealer Publishing Company,*
    486 U.S. 750 (1988) ................................................................... 54

*Conlon v. InterVarsity Christian Fellowship,*
    777 F.3d 829 (6th Cir. 2015) ...................................................... 60

*Dambrot v. Central Michigan University,*
    55 F.3d 1177 (6th Cir. 1995) .................................................. 47, 48

*Davis v. Colerain Township,*
    51 F.4th 164 (6th Cir. 2022) ....................................................... 43

*Doe v. Bolton*,
    410 U.S. 179 (1973) ....................................................................... 36

*Doster v. Kendall*,
    54 F.4th 398 (6th Cir. 2022) .................................................... 48, 54

*Duquesne University of the Holy Spirit v. NLRB*,
    947 F.3d 824 (D.C. Cir. 2020) ................................................... 53

*Federal Election Commission v. Wisconsin Right To Life, Inc.*,
    551 U.S. 449 (2007) ....................................................................... 45

*Franciscan Alliance, Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) .................................................... 42, 48

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ....................................................... 53, 65, 66

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
    23 F.3d 1071 (6th Cir. 1994) ....................................................... 51

*Gooding v. Wilson*,
    405 U.S. 518 (1972) ....................................................................... 50

*Green Party of Tennessee v. Hargett*,
    791 F.3d 684 (6th Cir. 2015) ....................................................... 36

*Hall v. Baptist Memorial Health Care Corp.*,
    215 F.3d 618 (6th Cir. 2000) .................................................. 59, 63

*Haynes v. Neshewat*,
    729 N.W.2d 488 (Mich. 2007) ..................................................... 10

*Hill v. Snyder*,
    878 F.3d 193 (6th Cir. 2017) ....................................................... 45

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ........................................................................... 48

*Hormel v. Helvering*,
    312 U.S. 552 (1941) ....................................................................... 55

*Hosanna-Tabor Evangelical Lutheran Church & School*
    *v. E.E.O.C.,*
    565 U.S. 171 (2012) .......................................................... 52, 59, 60

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) ............................................. 28, 36, 42

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ........................................................ 62

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..................................................................... 34

*McKay v. Federspiel,*
    823 F.3d 862 (6th Cir. 2016) ...................................... 23, 38, 43, 44

*Means v. United States Conference of Catholic Bishops,*
    2015 WL 3970046 (W.D. Mich. 2015) ........................................... 64

*Means v. United States Conference of Catholic Bishops,*
    836 F.3d 643 (6th Cir. 2016) ........................................................ 64

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ....................................................................... 5

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ................................................. 56, 57

*Michigan State Chamber of Commerce v. Austin,*
    788 F.2d 1178 (6th Cir. 1986) ..................................................... 36

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    559 U.S. 229 (2010) ............................................................... 43, 45

*Moon v. Michigan Reproductive & IVF Center, P.C.,*
    810 N.W.2d 919 (Mich. Ct. App. 2011) ......................................... 40

*N.L.R.B. v. Catholic Bishop of Chicago,*
    440 U.S. 490 (1979) ..................................................................... 52

*National Organization for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013) ......................................................... 42

*National Rifle Association of America v. Magaw,*
132 F.3d 272 (6th Cir. 1997) ........................................................34

*North Carolina Right to Life, Inc. v. Bartlett,*
168 F.3d 705 (4th Cir. 1999) ........................................................42

*Ohio National Life Insurance Company v. United States,*
922 F.2d 320 (6th Cir. 1990) ........................................................24

*Online Merchants Guild v. Cameron,*
995 F.3d 540 (6th Cir. 2021) ........................................................38

*Our Lady of Guadalupe School v. Morrissey-Berru,*
140 S. Ct. 2049 (2020) ..............................................52, 59, 60, 64

*Penn v. New York Methodist Hospital,*
884 F.3d 416 (2d Cir. 2018).........................................................59

*Peoples Rights Organization, Inc. v. City of Columbus,*
152 F.3d 522 (6th Cir. 1998) ........................................................36

*Picard v. Magliano,*
42 F.4th 89 (2d Cir. 2022) ...........................................................28

*Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati,*
822 F.2d 1390 (6th Cir. 1987) ......................................................34

*Platt v. Board of Commissioners on Grievances & Discipline of Ohio Supreme Court,*
769 F.3d 447 (6th Cir. 2014) ..................................................36, 38

*Ramirez v. Collier,*
595 U.S. 411 (2022) .....................................................................67

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) .........................................................57, 58, 66

*Religious Sisters of Mercy v. Becerra,*
55 F.4th 583 (8th Cir. 2022).........................................................48

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ........................................................................ 66

*Roe v. Wade*,
    410 U.S. 113 (1973) ........................................................................ 64

*Rouch World, LLC v. Department of Civil Rights*,
    987 N.W.2d 501 (Mich. 2022) ..................................................... 9, 14

*Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Company*,
    860 F.3d 844 (6th Cir. 2017) ........................................................ 25

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) ................................................. passim

*Stryker Employment Company, LLC v. Abbas*,
    60 F.4th 372 (6th Cir. 2023) ........................................................ 25

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................... 3, 27, 34, 38

*Universal Life Church Monastery Storehouse v. Nabors*,
    35 F.4th 1021 (6th Cir. 2022) .................................................. 35, 37

*Virginia v. American Booksellers Association, Inc.*,
    484 U.S. 383 (1988) ................................................................ 34, 35

*Vitagliano v. County of Westchester*,
    71 F.4th 130 (2d Cir. 2023) .......................................................... 37

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1871) ...................................................... 59

*Whole Woman's Health v. Jackson*,
    595 U.S. 30 (2021) ........................................................................ 35

*Winter v. Wolnitzek*,
    834 F.3d 681 (6th Cir. 2016) ................................................... 44, 45

*Wollschlaeger v. Governor*,
    848 F.3d 1293 (11th Cir. 2017) .................................................... 42

## Statutes

18 U.S.C. § 2339B ................................................................ 48

42 U.S.C.A. § 2000e-1 ...................................................... 62, 67

42 U.S.C.A. § 300a-7 .............................................................. 64

MCL 37.2102 ................................................................... 8, 9

MCL 37.2202 ................................................. 9, 32, 61, 63

MCL 37.2206 ............................................................... passim

MCL 37.2208 ................................................... 10, 52, 65

MCL 37.2302 ............................................................... passim

MCL 37.2602 ..................................................................... 12

MCL 37.2605 ............................................... 8, 10, 12, 32

MCL 37.2705 ...................................................................... 47

MCL 750.146 ............................................................... 8, 47

MCL 750.147 ............................................................... passim

## Other Authorities

Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe
School*: Too Broad? Or Broad As It Needs to Be?*, 25 Tex. Rev.
L. & Pol. 319 (2021) ................................................... 62

Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame
L. Rev. 1253 (2023) ...................................................... 59

MCRC Annual Report (2022) ............................................. 38, 39

Order, Amend. of Rule 1.109 of the Mich. Ct. Rules, Mich. Sup. Ct.
(Sept. 27, 2023) ............................................................. 30

S.B. 4, 102d Leg., Reg. Sess. (Mich. 2023) ............................. 15

Sara Boboltz, *This Michigan Hair Salon Owner Will Apparently Refuse Trans and Queer Clients*, HuffPost, July 11, 2023 ............ 17

Senate Comm. Test. 1:24:38-1:25:05 (Feb. 9, 2023) ................................ 15

Senate Comm. Test. 25:00-25:10 (Feb. 2, 2023) ..................................... 15

## **Rules**

Fed. R. App. P. 4 ................................................................................ 2

MDCR Rule 37.11 ........................................................................ 12, 49

MDCR Rule 37.14 ............................................................................. 12

MDCR Rule 37.25 ........................................................................ 10, 53

MDCR Rule 37.4 ......................................................................... 12, 43

## **Constitutional Provisions**

U.S. Const. art. VI .......................................................................... 50

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant Christian Healthcare Centers, Inc. (Christian Healthcare or the ministry) respectfully requests oral argument. Christian Healthcare provides much-needed medical care to members of its community as an extension of its religious calling to serve others. To fulfill that mission, the ministry (1) hires employees who share its faith and (2) operates consistent with its religious beliefs. But Appellees Attorney General Dana Nessel, the Michigan Department of Civil Rights' executive director, and the Michigan Civil Rights Commission's individual members (Michigan) interpret the Elliott-Larsen Civil Rights Act (ELCRA) and Michigan's public-accommodations law to compel Christian Healthcare to (1) hire employees who reject the ministry's faith, (2) use patients' pronouns in conflict with the ministry's beliefs, and (3) prescribe cross-sex hormones that violate its beliefs.

Michigan actively enforces its laws, prosecutes other religious organizations, and refuses to disavow enforcement of its laws against Christian Healthcare. Even so, the district court concluded that Christian Healthcare did not face a credible threat of enforcement because the ministry *might* be entitled to an exemption after it endures an onerous investigation and administrative hearing. In reaching that conclusion, the district court misapplied this Court's standing jurisprudence. Oral argument is warranted to aid the Court in resolving important Article III issues and to clarify the appropriate analysis.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Christian Healthcare's case and the requested injunctive relief under 28 U.S.C. §§ 1331 and 1343 because Christian Healthcare raises First and Fourteenth Amendment claims. Compl., R.1, PageID#57–73.

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292. The district court entered a final judgment on March 29, 2023, dismissing Christian Healthcare's claims and denying the ministry's preliminary injunction motion. Order & Judgment, RR.28–29, PageID#854, 878. The district court denied the ministry's motions to reconsider and to supplement the record on August 22, 2023. Order, R.45, PageID#1205. Christian Healthcare timely filed its notice of appeal on August 22, 2023, because the ministry's motion to reconsider tolled the appeal deadline. Fed. R. App. P. 4(a)(1)(A), (a)(4)(A)(iv)-(vi); Notice of Appeal, R.46, PageID#1206.

# STATEMENT OF ISSUES

To meet Article III's injury-in-fact requirement in a pre-enforcement case, a plaintiff need only show "a substantial risk" of "harm." *Susan B. Anthony List v. Driehaus* (*SBA List*), 573 U.S. 149, 158 (2014) (cleaned up). Christian Healthcare challenges ELCRA and Michigan's public-accommodations law because these laws arguably (1) prohibit the ministry from hiring employees who share its faith; (2) force the ministry to use patients' pronouns in violation of its beliefs; and (3) require the ministry to prescribe cross-sex hormones contrary to its beliefs. Michigan aggressively enforces those laws, recently amended ELCRA, and never disavows enforcement here while prosecuting other religious organizations elsewhere.

The district court denied Christian Healthcare standing. On that court's logic, Christian Healthcare must wait for a complaint, defend itself against Michigan's aggressive enforcement, and hope that Michigan exempts the ministry. The issues on appeal are:

1. Whether Christian Healthcare has standing and presents ripe claims.

2. Whether Christian Healthcare is entitled to a preliminary injunction when the First Amendment protects its employment choices, pronoun uses, and decision not to prescribe cross-sex hormones.

# INTRODUCTION

Christian Healthcare is a religious medical ministry that provides high-quality primary care to West Michigan. Christian Healthcare serves everyone, including those who identify as LGBT. It also steeply discounts the cost for members unable to afford its care. To accomplish its goals, the ministry hires employees who share its faith, serves patients consistent with its religious beliefs, and communicates its views to prospective employees and the public.

But like many jurisdictions, Michigan interprets the ban on religious, sex, sexual-orientation, and gender-identity discrimination in the ELCRA and its public-accommodation law as prohibiting these activities. These laws prevent Christian Healthcare from hiring staff who agree with its religious values, force the ministry to use pronouns and prescribe cross-sex hormones contrary to its beliefs about the immutability of sex, and act like a speech code to censor the ministry from publicly explaining its religious beliefs and policies.

The State aggressively enforces these laws. Michigan has investigated and prosecuted *thousands* of employers and public accommodations, including several faith-based businesses and organizations right now. Michigan recently fortified ECLRA with amendments. And Michigan has repeatedly announced in courts across the country that it applies *Bostock*'s logic to its laws, and that refusing to use a person's chosen pronouns or declining medical procedures to facilitate gender

transitions is discriminatory. Faced with this hostile record, Christian Healthcare filed this pre-enforcement action to protect its First Amendment freedoms.

At the district court, Michigan feigned ignorance about how its laws apply here. But Michigan never disavowed enforcement of its laws against Christian Healthcare or the positions it has taken in prior cases. The district court mistook Michigan's coyness as a virtue. As that court saw it, Christian Healthcare did not face a credible threat because Michigan's laws apply only "where permitted by law" and allow for bona-fide-occupational-qualification (BFOQ) exemptions.

These *hypothetical* exemptions are irrelevant when Michigan's actual actions and statements prove a credible threat. Couple that with Michigan's refusal to disavow, the laws' stiff penalties, and the laws' easy enforcement mechanisms, and the ministry can justify standing many times over. In saying otherwise, the district court effectively asked the ministry to "bet the farm" by hoping it can win on affirmative defenses to avoid liability. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

Courts routinely allow pre-enforcement lawsuits to avoid the ministry's dilemma. This Court should reverse, reinstate Christian Healthcare's claims, and preliminarily enjoin Michigan from enforcing its laws against the ministry.

## STATEMENT OF THE CASE

### I.    Christian Healthcare provides attentive medical care based on its religious calling to look after those in need.

Christian Healthcare fulfills the biblical mandate to serve others by offering medical and wellness services to the public. Compl., R.1, PageID#6–16. Because Christian Healthcare believes that everyone has inherent worth, it treats all patients, regardless of their personal characteristics. *Id.*, PageID#6–10. Christian Healthcare has treated and presently treats patients who identify as transgender. *Id.*, PageID#9. And the ministry offers sharply discounted services to low-income families. *Id.*, PageID#10.

Christian Healthcare follows a membership model where member-patients receive access to medical services for a monthly fee. *Id.*, PageID#8–9. This model allows the ministry's staff to spend time with each patient, offer to pray with them, and discuss the spiritual dimensions of sickness. *Id.*, PageID#8, 15. Christian Healthcare contributes to its members' well-being by incorporating spiritual care with physical wellness. *Id.*, PageID#14–16, 18–19; Compl. Ex. 3, R.1–5, PageID#112–20.

To that end, Christian Healthcare requires its employees to agree with and abide by its beliefs because it depends on those employees to share that faith with others. Compl., R.1, PageID#16–26. Christian Healthcare only recruits, hires, and retains employees who ascribe to its

beliefs and requires its employees to follow policies reflecting those beliefs. *Id.*; Compl. Exs. 4–15, RR.1–6-1–17, PageID#121–153. Christian Healthcare has *previously* posted those policies in job announcements and requires employees to re-affirm their commitment each year. Compl., R.1, PageID#17, 50–51, 55–56; Blocher Decl., R.5–2, PageID#183–186.

Christian Healthcare also follows and adopts policies to ensure its medical care adheres to its faith. For example, Christian Healthcare believes that sex is unchangeable. So Christian Healthcare refers to patients using pronouns that align with their sex and declines to facilitate gender transitions, including by refusing to prescribe cross-sex hormones. Compl., R.1, PageID#17–18, 22; Compl. Exs. 3–4, 6, RR.1–5-1–6, 1–8, PageID#116, 122, 126. When a conflict arises, the ministry works with the patient to develop a mutually agreeable resolution so that it can continue to provide excellent care consistent with its beliefs. Compl., R.1, PageID#52–54.

Christian Healthcare always desires to be transparent with prospective members, existing members, and the public. Christian Healthcare has *previously* posted its Membership Agreement online, which includes statements about its religious beliefs, its pronoun policy, and its gender-transition policy. *Id.*, PageID#11. That way, prospective members can make an informed choice before entering Christian Healthcare's care.

## II.    Michigan's laws affect Christian Healthcare.

Michigan's ELCRA (MCL 37.2101 *et seq.*) and public-accommodations law (MCL 750.146–47) regulate public accommodations and employers. They do so through the (A) Accommodation Clause; (B) Employment Clause; and (C) Publication Clause. Unlike most states, Michigan does not exempt religious organizations. State Survey, R.5–8, PageID#335–37.

### A.    The Accommodation Clause.

The Accommodation Clause prohibits public accommodations from denying "equal enjoyment" and "equal utilization" of their services "because of" religion, sex, sexual orientation, and gender identity. MCL 37.2302(a); MCL 37.2102(1). This clause also bars "pattern[s] or practice[s]" that differentiate based on these traits. MCL 37.2605. Taken together, these provisions ban outright denials *and* any differentiation in a service—and any policy that condones any distinctions—"because of" a protected trait. *See* Compl., R.1, PageID#35 (collecting cases).

The "because of" causation standard "is established where the discriminatory action would not have occurred but for the [protected trait] of the complainant." *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 512 (Mich. 2022). Michigan grafted the reasoning from *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), onto the Accommodation Clause's "because of" standard. *Rouch World*, 987 N.W.2d at 513. Under this interpretation, a public accommodation

violates the clause if it "relies in part on sex [or other protected trait] when deciding to deny a public accommodation—or, put differently," a violation occurs "if changing the sex [or other protected trait] of the individual would have led to a different choice by the business." Br. on Appeal of Appellants at 25, *Rouch World, LLC v. Mich. Dep't of C.R.*, 987 N.W.2d 501 (Mich. 2022) (No. 162482), https://perma.cc/EH2F-BNKB; *Rouch World* Br., R.22–4, PageID#679–82.

### B.  The Employment Clause.

The Employment Clause prohibits employers from making employment decisions "because of" religion, sex, marital status, sexual orientation, and gender identity. MCL 37.2102(1). This applies to recruiting, hiring, disciplining, terminating, and retaining employees or any other decision that might "adversely affect[ ]" an employee. MCL 37.2202(1). This clause also applies to employment patterns, policies, and practices and prohibits any distinctions "because of" a protected trait. *See id.*; MCL 37.2206(2); MCL 37.2605(1).[1]

The Employment Clause allows employers to apply to the Commission for a BFOQ. MCL 37.2208; MDCR Rule 37.25(1). But that

---

[1] Michigan courts interpret the Accommodation Clause to prohibit employment discrimination. *Haynes v. Neshewat*, 729 N.W.2d 488, 491, 493 (Mich. 2007). References to the Employment Clause herein include this interpretation of the Accommodation Clause.

process is invasive, can prompt an investigation, must be re-upped every five years, and is rarely successful. *See infra* § I.C.2.

## C.  The Publication Clause.

The Publication Clause includes three provisions that prohibit employers and public accommodations from publishing or communicating certain statements: MCL 37.2206(1)–(2), MCL 37.2302(b), and MCL 750.147.

Employers cannot post job announcements indicating a preference "based on" religion or other protected traits. MCL 37.2206(1)–(2). Nor can employers ask prospective employees about "information concerning" or enact written policies related to religion or other protected traits. *Id.* Meanwhile, public accommodations cannot publish statements or policies that "indicate[] that the full and equal enjoyment" of public accommodations will be denied or that anyone is "objectionable, unwelcome, unacceptable, or undesirable" " based on sex, sexual orientation, gender identity, religion, and other characteristics. MCL 37.2302(b); MCL 750.147. The Publication Clause acts like a speech code, chilling verbal and written statements.

## III.  Michigan's laws are easy to enforce and impose severe penalties that would ruin Christian Healthcare.

Michigan's laws are easy to enforce. Any "aggrieved" person—including individuals, associations, and advocacy organizations—the Commission, the Director, and testers can file an ELCRA complaint.

Compl., R.1, PageID#42. To complain, an "aggrieved" person need not be denied employment or services. Seeing an objectionable sign or knowing about an objectionable policy can trigger complaints. *Id.*, PageID#42. And Michigan facilitates complaints by allowing "aggrieved" persons to file them online. *See* Mich. Dep't of C.R., Compl. Request, https://perma.cc/7FF5-7VN3 (last visited Dec. 14, 2022).

Michigan actively investigates complaints. *See* MCL 37.2602(c); Compl., R.1, PageID#44. The burdensome investigation requires respondents to file responses under oath, produce documents, and give testimony. MCL 37.2602(d); MDCR Rule 37.11(1). If a respondent declines, it is subject to a default judgment or court-ordered compulsion. MDCR Rule 37.4(10), 37.14(1), 37.11(6). If Michigan determines that a respondent has engaged in unlawful practices, Michigan can award significant penalties—including six-figure damages, attorney fees, and civil fines up to $50,000—require hiring or reinstating an employee, compel the requested service, and revoke state-approved licenses. MCL 37.2605(1)–(2); Compl., R.1, PageID#43.

Any person may sue a public accommodation for violating the public-accommodations law and can recover "treble damages." MCL 750.147. And Attorney General Nessel can criminally prosecute violators of the public-accommodations law's Publication Clause. Compl., R.1, PageID#5, 44. Public accommodations that violate this

11

clause are guilty of a misdemeanor and may be subject to fines and jailtime. MCL 750.147.

## IV. Michigan expands ELCRA through an unlawful Interpretative Statement, litigation, and legislation and rejects proposed religious exemptions.

For the past several years, Michigan has feverishly expanded ELCRA to include sexual orientation and gender identity while rejecting any religious accommodations.

In 2018, Michigan's Commission adopted Interpretative Statement 2018–1, which reinterpreted ELCRA's "because of sex" prohibition to include sexual orientation and gender identity. Compl., R.1, PageID#26. The Commission immediately began investigating complaints on these bases, including 73 such complaints within the first year. *Id.*, PageID#44. The Commission adopted this interpretation and investigated these cases even though it contradicted state law at the time. *Id.* The Commission did so against the advice of its own counsel, who told the Commission that it lacked authority to adopt this interpretation, the interpretation would be "unlawful," and the Commission would "waive their governmental immunity" for adopting it. Comm'n Tr., R.22–4, PageID#718–23, 727. In adopting the statement, the Commission rejected a proposal stating that ELCRA "may not be applied in a manner that infringes on the constitutionally protected practice of religion." *Id.*, PageID#716.

12

Shortly after adopting Interpretative Statement 2018–1, Michigan began investigating two businesses that operate according to their owners' religious beliefs for alleged sexual-orientation and gender-identity discrimination. Compl., R.1, PageID#26. Michigan defended its interpretation in court. A state court held that "sex" in ELCRA includes gender identity. *Id.* Then, in 2022, Michigan's Supreme Court ruled that discrimination "because of … sex" in ELCRA includes sexual-orientation discrimination. *Rouch World*, 987 N.W.2d at 504.

One dissenting justice lamented that ELCRA does not exempt religious organizations. *Id.* at 556 (Viviano, J., dissenting). He criticized the majority for not considering how its "interpretation violates constitutional protections of religious liberty." *Id.*

Unsatisfied, Attorney General Nessel and the Commission pressed the legislature to codify *Rouch World* by statute. Press Release & Resolution, RR.26–1, 26–2, PageID#814–20. Eventually, Michigan's legislature adopted the decision by amending ELCRA to prohibit discrimination because of "sexual orientation" and "gender identity or expression." S.B. 4, 102d Leg., Reg. Sess. (Mich. 2023), https://perma.cc/GN97-M2Y7.

As with the Interpretative Statement and *Rouch World*, Michigan's Legislature rejected every proposed religious exemption. These proposals would have protected individuals from being forced to "violate [their] sincerely held religious beliefs," exempted religious

employers, and codified the ministerial exception. Legislative History, R.30–4, PageID#898–902, 919–22, 932–33. Several Michigan legislators voting against the exemptions mischaracterized them as a "license to discriminate," Senate Comm. Test. 1:24:38-1:25:05 (Feb. 9, 2023), https://perma.cc/T6HY-6L8X, and "allow[ing] bigotry and discrimination to rule," Legislative History, R.30–4, PageID#910–11. One legislator proclaimed, "Bigotry under a veneer of religion is still bigotry." *Id.*, PageID#966.

During his testimony, current Commissioner Luke Londo advocated for the position that "it should be illegal to discriminate against someone on the basis of sexual orientation, gender identity and expression *even if it conflicts with their own religious beliefs*." Senate Comm. Test. 25:00-25:10 (Feb. 2, 2023) (emphasis added), https://bit.ly/3KdEkh8.

After the legislature amended ELCRA, Attorney General Nessel and the Commission publicly supported the law—despite its lack of religious exemptions. Press Releases, R.30–4, PageID#963–65.

## V.  Michigan actively enforces its laws against other faith-based organizations and businesses.

Michigan aggressively investigates faith-based organizations and businesses.

In 2019, Michigan received complaints against a wedding venue that declined to host a same-sex wedding and against an electrolysis for

declining to remove hair from a male who identifies as female. MDCR Compl., RR.5–8, 6, PageID#341, 360–61. The business owners argued that providing the requested services would violate their religious beliefs about marriage and the immutability of sex—"that there are two sexes, male and female." *Rouch World* Br., R.22–4, PageID#688–90; *see also* Letters, RR.6, 6-1-6–2, PageID#348–50, 370–75.

Michigan disregarded these objections. Michigan investigated and ordered the businesses to respond to invasive questions and produce innumerable documents. Orders, R.6, 6–2, PageID#351–59, 376–85. And Michigan argued that their religious beliefs "do not allow business owners to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law" like "ELCRA." *Rouch World* Br., R.22–4, PageID#695–97.

Michigan has continued similar investigations during *this* litigation. In May 2023, Michigan began investigating Catholic Charities for alleged gender-identity discrimination. Mot. to Supp. & Ex., R.35–1-35–2, PageID#1044–1059. The initial investigation forced Catholic Charities to produce 12 categories of documents, including information about "all employees," training, "all other properties owned," and other documents. *Id.*, PageID#1058.

 In July 2023, Michigan began investigating 12 complaints against a hairstylist for a post she published on social media commenting on gender identity. *See* Mot. for Leave to Suppl. Record 5; Hoff. Decl. in

Supp. of Mot. to Suppl. (Hoff. Decl.) Ex. 3. The complaints apparently stemmed from the post alone—*not* an actual denial of a service. Sara Boboltz, *This Michigan Hair Salon Owner Will Apparently Refuse Trans and Queer Clients*, HuffPost, July 11, 2023, https://perma.cc/M2ZA-2TRM.

And Michigan recently received a complaint against Catholic health clinic—Emmaus Health Partners—alleging gender-identity discrimination. *See* Mot. for Leave to Suppl. Record 4; Hoff. Decl. in Supp. of Mot. to Suppl. (Hoff. Decl.) Ex. 2.

Elsewhere, Michigan has argued that laws like Michigan's trump First Amendment liberties. For example, Michigan argued that neither the "right of expressive association," the "doctrine of church autonomy," or the "Religious Freedom Restoration Act" protect the freedom of a Catholic school to terminate a substitute teacher for publicly advocating positions contrary to Catholic teaching. Br. for Mass. et al. as Amici Curiae in Supp. of Pl.-Appellee at 18–25, *Billard v. Charlotte Cath. High Sch.*, No. 22-1440 (4th Cir. Nov. 30, 2022), https://bit.ly/3QmxusP. And Michigan argued that Colorado's public-accommodations law could force a website designer to create custom websites celebrating a view of marriage contrary to her religious beliefs without violating her freedom of speech. Br. for Mass. et al. as Amici Curiae in Supp. of Resp'ts, *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Aug. 19, 2022), 2022 WL

3691314 at *18–31. Michigan called this a "sovereign and compelling interest[ ]." *Id.* at *4.

## VI.    Other jurisdictions say—and Michigan agrees—that it is unlawful to refuse to use a person's chosen pronouns or to decline medical procedures to facilitate gender transitions.

Other jurisdictions interpret laws like Michigan's to require public accommodations to use a person's chosen pronouns and to mandate that medical providers facilitate gender transitions. Colorado, Iowa, New Jersey, New York, and Washington apply similar laws to require public accommodations like Christian Healthcare to use customer's chosen pronouns no matter if those pronouns align with their sex. Compl., R.1, PageID#35–36. Courts in California and New York have held that analogous laws demand this result. *Id.* Likewise, other jurisdictions require health-care providers to provide gender-transition services, such as cross-sex hormones, if they would provide similar treatment for other purposes. *Id.*, PageID#37. Michigan has even joined several briefs adopting these views, concluding that practices like Christian Healthcare's are unlawful. *Infra* § I.A.2.

## VII.    Christian Healthcare learns that Michigan prosecutes faith-based businesses, then self-censors and refrains from activities to avoid prosecution.

Christian Healthcare heard about *Rouch World* in 2021 after significant media attention. Compl., R.1, PageID#28. The ministry also learned that other medical providers were being sued and threatened

with penalties. *Id.* Christian Healthcare then realized that ELCRA and the public-accommodations law affected its freedom to adopt employment and other policies according to its religious beliefs. *Id.*, PageID#45–57.

Recognizing these threats, Christian Healthcare tried to avoid prosecution after *Rouch World* by chilling its speech. Christian Healthcare has refrained from asking prospective employees questions about whether they agree with the ministry's religious beliefs, refused to publicize job openings, and removed its employment application from its website. *Id.*, PageID#49–51. The ministry has taken these steps solely because of the Employment and Publication Clauses. *Id.*, PageID#55–56. This has a cost. Despite Christian Healthcare's ongoing employment needs, Michigan's laws have hindered the ministry's ability to manage employment decisions and recruit new employees. *See* Blocher Decl., R.5–2, PageID#183–86.

Christian Healthcare has also been forced to remove its Membership Agreement from its website which disclosed its pronoun and cross-sex hormone policy because of the Accommodations and Publication Clauses. *Id*. This has prevented Christian Healthcare from being transparent with prospective members about the medical services it provides. *Id.*; Compl., R.1, PageID#54–55.

In other ways, Christian Healthcare operates each day under the constant threat of Michigan's laws. For example, Christian Healthcare

still follows its pronoun policy for its current patients who identify as a gender other than their sex. Compl., R.1, PageID#53–54. Christian Healthcare regularly speaks to parents whose children suffer from gender dysphoria, serves patients who identify as transgender, and follows its cross-sex hormone policy. *Id.* And the ministry requires employees to re-affirm their commitment to the ministry's religious beliefs annually. *Id.*, PageID#16–17.

   But Christian Healthcare cannot continue to provide medical care to its community under these burdens. Nor can the ministry abandon its religious calling to serve others by leaving the medical industry. Left with no other legitimate options, Christian Healthcare filed this lawsuit. *Id.*, PageID#29.

## VIII. The district court dismisses Christian Healthcare's lawsuit even though Michigan refused to disavow and actively prosecutes other religious organizations.

Christian Healthcare sought declaratory and injunctive relief to prevent Michigan from violating its constitutional rights. *See* Compl., R.1, PageID#1–73. The ministry simultaneously moved for a preliminary injunction. Pls.' MPI & Br., RR.5, 7, PageID#170, 405.

Michigan opposed the injunction and moved to dismiss, arguing that Christian Healthcare lacked standing and ripe claims. *See* Defs.' Mots., RR.18, 20, 23, PageID#487, 542, 746. Michigan's motion to dismiss relied on evidence beyond the complaint. *See* Trevino Decl. &

Exs., R.23–1, PageID#769–800 (filed in support of Michigan's motion to dismiss).

Christian Healthcare later filed a notice of supplemental authority detailing new amici briefs, press releases, resolutions, and regulations that Michigan had signed or announced related to topics in this litigation. *See* Supp. Auth., RR.26, 26–4, PageID#806–45.

The district court granted Michigan's motion to dismiss and denied Christian Healthcare's preliminary-injunction motion. Order, R.28, PageID#877. The court considered the supplemental materials. *Id.*, PageID#863. But the court concluded that the ministry's desired activities were not arguably proscribed by Michigan's law, and that it did not face a credible threat of enforcement. *Id.*, PageID#869–77.

For both conclusions, the district court relied on passing references to exemptions where "permitted by law" and to BFOQs. *Id.* In its view, Michigan's laws do not "facially fail[ ] to recognize religious freedoms like those asserted by Plaintiff" and "Michigan statutes do not 'arguably' provide that religious freedoms will not be considered." *Id.*, PageID#870–71. And because Christian Healthcare *might* be able to prove that it is exempted under these provisions at a State administrative hearing, it lacked a credible threat of enforcement.

The district court also evaluated the standing factors from *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016). The court held that Christian Healthcare failed these factors even though Michigan actively

20

enforces its law, Michigan said disavowal was "impossible," and Michigan conceded that its laws encourage public enforcement. Order, R.28, PageID#874–76; Defs.' MTD Reply, R.23, PageID#759 (admitting the statutes "provide for public enforcement"). The court entered final judgment. Judgment, R.29, PageID#878.

    Shortly afterwards, Christian Healthcare moved to reconsider the dismissal, highlighting statements against religious exemptions made during the ELCRA amendment process. Pl.'s Mot. for Recons., R.30, PageID#881–83. Christian Healthcare also provided information about Michigan's BFOQ history, which established that Michigan has only ever granted four religious BFOQ exemptions since 1977, has never granted a religious BFOQ for a medical ministry, and limits religious BFOQs to ministerial positions. *See id.*, PageID#883, 886.

    The ministry later moved to supplement its motion to reconsider with evidence that Michigan was investigating Catholic Charities for alleged gender-identity discrimination. Mot. to Supp., R.35, PageID#1039–41.

    The district court considered this evidence. Order, R.45, PageID#1198, 1200–01. But the court denied the ministry's motions after concluding the evidence didn't establish standing. *Id.*, PageID#1205. Christian Healthcare timely appealed the court's (a) grant of Michigan's motion to dismiss, and denial of its (b) motion to

reconsider that dismissal, (c) motion to supplement, and (d) preliminary-injunction motion.

## STANDARD OF REVIEW

De novo review applies to the grant of a motion to dismiss, the denial of a motion to reconsider that dismissal, and the denial of a preliminary injunction based on standing. *Bouye v. Bruce*, 61 F.4th 485, 489 (6th Cir. 2023); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). Michigan's motion to dismiss raised a factual challenge to Christian Healthcare's standing. So this Court may consider the evidence below to evaluate standing. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

Abuse-of-discretion review ordinarily applies to a district court's denial of a motion to supplement a pleading. But here, the district court denied the ministry's motion based on its misapplication of Article III standing law. "[A] district court necessarily abuses its discretion when it commits an error of law." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 854 (6th Cir. 2017). And this Court reviews legal errors regarding jurisdiction de novo. *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 380 (6th Cir. 2023). So de novo review applies to the district court's denial of the motion to supplement.

## SUMMARY OF THE ARGUMENT

The district court erred by assuming that Michigan will respect Christian Healthcare's First Amendment rights when applying its laws that reference *possible* exemptions "where permitted by law" and *hypothetical* BFOQs. That assumption is not credible given Michigan's actions and statements elsewhere. And this assumption confuses merits and standing. Christian Healthcare need only show the laws *arguably* cover its activities and enforcement officials will *credibly*—not inevitably—enforce them. The ministry has done so and thereby established its standing and its entitlement to a preliminary injunction.

Christian Healthcare has (I) standing and ripe claims. Its activities are arguably affected with a constitutional interest, and Michigan's laws arguably proscribe those activities. Michigan never disavows Christian Healthcare's interpretation of how Michigan's laws apply, and Michigan actively prosecutes employers and public accommodations like Christian Healthcare. So a presumption of a credible enforcement threat applies here.

Other factors bolster Christian Healthcare's standing. And because Christian Healthcare presents a comprehensive record, its claims are ripe. The someday exemptions the district court relied on do not defeat Christian Healthcare's standing, especially because Michigan has forced the ministry to chill its speech on employment, pronouns, and cross-sex hormones.

23

Christian Healthcare is also (II) entitled to a preliminary injunction. The ministry is likely to succeed on the merits of its claims that Michigan's law violates the First Amendment by forcing Christian Healthcare to express messages about gender identity it disagrees with, chilling the ministry's speech, requiring the ministry to hire employees who oppose its religious mission, and compelling the ministry to provide medical care that violates its convictions. This Court should issue that injunction in the first instance.

## ARGUMENT

## I.    Christian Healthcare has standing and its claims are ripe.

Christian Healthcare has standing and its claims are ripe because the ministry comprehensively explained its activities and Michigan's law prohibits them. Standing requires injury-in-fact, causation, and redressability. *SBA List*, 573 U.S. at 157. The ministry must also show ripeness. *Id.* at 157 n.5. The district court only addressed injury-in-fact and ripeness. Order, R.28, PageID#866 & n.2. But the ministry can show these because (A) Michigan's laws credibly threaten it; (B) the record supplies enough facts for ripe review; and (C) the district court erred in holding otherwise.

### A.    Christian Healthcare has standing because Michigan's laws credibly threaten and chill its activities.

For injury-in-fact, Christian Healthcare need only prove a "substantial risk" of Michigan's law harming it. *SBA List*, 573 U.S. at 158. Christian Healthcare does so because it meets the Supreme Court's three-part test for pre-enforcement standing: (1) it intends to "engage in a course of conduct arguably affected with a constitutional interest"; (2) its activities are arguably "proscribed by" Michigan's laws; and (3) it faces a "credible threat of prosecution." *Id.* at 159. Other factors (4) bolster the ministry's standing.

### 1.    Christian Healthcare intends to and engages in activities protected by the First Amendment.

As a religious organization, Christian Healthcare's freedom to use sex-reflective pronouns, provide non-emergency medical care consistent with its religious beliefs, make employment decisions according to its beliefs, and publicly discuss its beliefs, are activities affected with a constitutional interest. *Infra* § II. Neither the district court nor Michigan disputed this element.

### 2.    Michigan's laws arguably prohibit Christian Healthcare's desired activities.

Michigan's laws also arguably prohibit Christian Healthcare's activities. For this factor, Christian Healthcare must offer a "*plausible* interpretation of the statute." *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th

Cir. 2022). Not the best. Not the only. Just a "reasonable enough" interpretation. *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022).

Michigan never denied that it considers Christian Healthcare to be a public accommodation and employer subject to the laws. Compl., R.1, PageID#29, 34. Neither did the district court. Instead, both relied on *possible future* exemptions. But that just shows the laws *arguably* apply to Christian Healthcare *now*. Otherwise, there would be no need for a potential exemption.

Specifically, Michigan's law *arguably* requires Christian Healthcare to use patients' chosen pronouns no matter if those pronouns align with their sex, *arguably* forces Christian Healthcare to offer cross-sex hormones to facilitate gender transitions, *arguably* prevents Christian Healthcare from hiring, recruiting, and retaining employees who share its beliefs, and *arguably* prohibits Christian Healthcare from publishing its pronoun, cross-sex hormone, and employment policies.

**Pronouns.** The Accommodation Clause prohibits public accommodations from denying the "equal enjoyment" or "equal utilization" of their services or following polices that have that affect. *Supra* Statement of the Case, § II.A. And Michigan argues under *Bostock* that public accommodations violate this clause if "changing the sex" or gender identity "of the individual would have led to a different choice by the business." Br. on Appeal of Appellants at 25, *Rouch World,*

*LLC v. Mich. Dep't of C.R.*, 987 N.W.2d 501 (Mich. 2022) (No. 162482), https://perma.cc/EH2F-BNKB.

Christian Healthcare refers to patients using sex-reflective pronouns. Compl., R.1, PageID#17–18, 35–36. But it will not refer to patients using pronouns when they reflect a patient's gender identity that differs from their sex. *Id.* To Michigan, this violates the Accommodation Clause because changing the patient's gender identity changes whether the ministry will use the patient's desired pronouns. Compl., R.1, PageID#35–36. Christian Healthcare will use a patient's pronoun when the patient's gender identity—and their desired pronoun—matches their sex, but not when a patient's gender identity—and their desired pronoun—conflicts with their sex. And the clause's "pattern and practice" rule arguably prohibits Christian Healthcare from following its policy of not "us[ing] pronouns or other forms of reference that do not accord with [a person's] biological sex." Compl. Ex. 6, R.1–8, PageID#126.

Michigan has been clear that "pronoun misuse" and "repeatedly using the wrong name and pronouns" constitutes discrimination. Br. of Cal. et al as Amici Curiae in Supp. of Neither Party, *Tennessee v. Dep't of Educ.*, No. 22-5807 (6th Cir. Dec. 22, 2022), 2022 WL 18027407 at *2, 12. Indeed, in adopting a chosen pronoun policy for Michigan's judiciary, a Michigan Supreme Court Justice explained that using "personally specified pronouns" "aligns with" ELCRA's prohibition on

27

sexual-orientation and gender-identity discrimination. Order, Amend. of Rule 1.109 of the Mich. Ct. Rules, Mich. Sup. Ct. (Sept. 27, 2023), https://perma.cc/LPX3-5PGZ. Other jurisdictions interpret laws like Michigan's similarly. Statement of the Case, § VI.

This shows that the Accommodation Clause at least *arguably* compels Christian Healthcare to use chosen pronouns contrary to its religious beliefs.

**Cross-sex hormones.** In similar ways, the Accommodation Clause also arguably requires Christian Healthcare to provide cross-sex hormones to facilitate gender transitions because it will prescribe testosterone for boys and men or estrogen for women to treat symptoms associated with low testosterone in men and menopause for women. Compl., R.1, PageID#22, 36–37; Woo Decl., R.5–3, PageID#189–93. And the clause's "pattern and practice" arguably forbids the ministry from following its policy of "refrain[ing] from facilitating any and all attempts to physically change or alter a patient's predominant biological sex." Compl. Ex. 6, R.1–8, PageID#126.

As Michigan recently argued elsewhere, "[b]anning medical care that only transgender individuals seek is discriminatory." Br. of Amici Curiae Cal. et al. at 15, *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, No. 23-2366 (7th Cir. Sept. 27, 2023), https://bit.ly/3M3cx3F. And, following its interpretation of *Bostock*, Michigan argued that prohibiting medical procedures for gender

transitions is discriminatory because the prohibition "imposes differential treatment on the basis of sex … *e.g.*, a cisgender young man can receive testosterone to initiate male puberty but a transgender young man cannot." *Id.* at 16.

Michigan also claimed that healthcare providers discriminate based on sex when they "authorize—or prohibit—identical medical procedures based on the *purpose* for which the treatment is being performed." Br. of Amici Curiae Cal. et al. at 10–11, *L.W. v. Skrmetti*, No. 23-5600 (6th Cir. Aug. 10, 2023), https://bit.ly/3rVZ0nx. Other jurisdictions interpret similar laws to prohibit similar distinctions. Statement of the Case, § VI. Under this logic, Christian Healthcare's practice arguably violates the Accommodation Clause.

**Employment.** The Employment Clause arguably prohibits Christian Healthcare from recruiting, hiring, and retaining employees who agree with its religious beliefs and following policies to that effect. Compl., R.1, PageID#30–31, 45–51; Compl. Exs. 4–12, RR.1–6-1–14, PageID#121–43. That's evident from the law's plain language, which prohibits recruiting employees "because of" religion or other protected characteristics, MCL 37.2202(1), declining to hire employees "because of" these characteristics, *id.*, and using or following a pattern or practice of such recruiting and hiring, MCL 37.2206(2), MCL 37.2605(1).

**Publications**. The Publication Clause also arguably forbids Christian Healthcare from describing its religious values to prospective

members or publishing its pronoun or cross-sex hormone policies. Compl., R.1, PageID#11, 38, 54–55. That Clause prohibits Christian Healthcare from "indicat[ing] that the full and equal enjoyment" of public accommodations will be denied or that anyone's membership is "objectionable, unwelcome, unacceptable, or undesirable" based on sex, sexual orientation, gender identity, and religion. MCL 37.2302(b); MCL 750.147. Christian Healthcare's polices arguably do that because the vague and overbroad language in Michigan's law act like a speech code, banning statements on certain topics. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 581 n.1 (2023) (interpreting Colorado's similar law to have similar prohibition).

Similarly, the Publication Clause prohibits employers from publishing anything that "indicates a preference … based on religion," sex, marital status, sexual orientation, or gender identity, "elicit" information about religion or these topics, or use "a written or oral inquiry or form of application that expresses a preference" based on religion or these topics. MCL 37.2206(1)–(2). This Clause arguably prohibits Christian Healthcare from publishing its religious values in employment applications and annual renewals and asking prospective employees about their faith, views on marriage, or stance on pronouns and cross-sex hormones because they all indicate the ministry requires employees to agree with its religious beliefs. Compl., R.1, PageID#31–32.

30

### 3.    Christian Healthcare deserves a presumption that it faces a credible enforcement threat.

Credible threat only requires a "substantial risk" of "harm" showing. *SBA List*, 573 U.S. at 158 (cleaned up). Christian Healthcare deserves a presumption that it meets this lenient standard because the ministry is an object of Michigan's laws, the laws arguably proscribe its desired activities, and Michigan never disavows despite active enforcement. The district court discounted this presumption by suggesting the phrase "enforcement presumption" does not appear in "caselaw." Order, R.28, PageID#867 n.3. But the Supreme Court has held that a pre-enforcement plaintiff has standing to challenge a law because there is "no reason to assume" the law "will not be enforced." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). That principle animates pre-enforcement precedent.

The presumption applies when a statute's "language" shows that a plaintiff "would be subject to application of the statute." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987). When plaintiffs are "an object of the action" at issue "there is ordinarily little question that the action or inaction has caused [their] injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). And so courts "routinely" hold that plaintiffs who are "subject to the regulatory burden imposed by a statute" have standing. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 282 (6th Cir. 1997).

Christian Healthcare is an object of Michigan's laws. The laws regulate employers and public accommodations. And Michigan considers Christian Healthcare to be an employer and public accommodation. Michigan never disclaims this interpretation.

What's more, the "surrounding factual circumstances show that a fear of prosecution is plausible." *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022). Michigan passed Interpretate Statement 2018–1 without legal authority, litigated *Rouch World*, and just amended ELCRA without religious exemptions. Statement of the Case, § IV. And Michigan just began prosecuting Catholic Charities and received a complaint against Emmaus Health—both religious organizations—for alleged gender-identity discrimination. *Id.* § V. This Court can "assume" Michigan's laws will be enforced under these circumstances. *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 393.

Michigan has also explained how it will enforce its law. Based on *Bostock*, Michigan says that if gender identity is a "but-for cause of" a decision, the decision violates Michigan's law. *Rouch World* Br., R.22–4, PageID#679–82. That's true even if "some other factor"—i.e., religion—"contributed to the challenged decision." *Id.*

The Supreme Court regularly presumes enforcement based on significantly less enforcement indicia. *E.g.*, *Whole Woman's Health v. Jackson,* 595 U.S. 30, 47 (2021) (standing when law had "a direct effect

on [abortion providers'] day-to-day operations"); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (standing when law "directly operate[d]" against abortion providers). This Court applies this presumption too, especially in First Amendment cases. *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 451 (6th Cir. 2014) ("[I]n a pre-enforcement review case under the First Amendment … courts do not closely scrutinize the plaintiff's complaint for standing.").[2]

Consider two recent examples.

In *Green Party of Tennessee v. Hargett*, minor political parties challenged a loyalty-oath provision that required them to attest they would not "advocate the overthrow of the government." 791 F.3d 684, 690 (6th Cir. 2015). The state argued the parties lacked standing because there was "no evidence that the statute [had] been, or would be, enforced." *Id.* at 695. But that did not negate the parties' credible threat of enforcement because the state never "explicitly disavowed enforcing it in the future." *Id.* at 696.

---

[2] *Yellen*, 54 F.4th at 336–37 (standing to challenge stimulus offset provision when federal government "intended to enforce" it); *Speech First, Inc.*, 939 F.3d at 766; *Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 529 (6th Cir. 1998) (standing where city's answer stated its "inten[t] to prosecute" "ordinance" violations); *Mich. State Chamber of Com. v. Austin*, 788 F.2d 1178, 1184 (6th Cir. 1986) (similar).

Likewise, in *Universal Life Church Monastery Storehouse v. Nabors*, ministers challenged a law that restricted wedding solemnizations. 35 F.4th Cir. at 1025, 1034–36. The defendants argued the ministers lacked standing because the law "ha[d] never been enforced by any State official, let alone the State officials named as defendants here." Br. of Defs.-Appellants, *Universal Life Church Monastery Storehouse v. Nabors*, Nos. 21-5048, 21-5100 (6th Cir. Apr. 19, 2021), 2021 WL 1671869 at *5. Even so, the ministers had standing because the defendants "never provided clear assurances that they will *not* prosecute [the] ministers." *Nabors*, 35 F.4th at 1035. That refusal to disavow was enough to establish a credible threat because the law regulated the ministers. *Id.*

*Green* and *Nabors* dispel the district court's demand that Christian Healthcare show an enforcement history against other religious employers and medical providers or a history of enforcement by Attorney General Nessel under MCL § 750.147. Order, R.28, PageID#859, 874–75; Order, R.45, PageID#1202. The *Green* and *Nabors* plaintiffs had standing despite *no* enforcement history against anyone. In fact, if adopted, the district court's past-prosecution requirement would create a circuit split. *See Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 140 (2d Cir. 2023) (per curiam) ("[T]he Supreme Court and at least four other circuits have sustained pre-enforcement standing

without a past enforcement action or an overt threat of prosecution
directed at the plaintiff.")

For these reasons, Christian Healthcare has plausibly alleged a
"substantial risk" of enforcement. *SBA List*, 573 U.S. at 158.

### 4. Although unnecessary for Christian Healthcare's standing, other factors support its credible threat of enforcement.

Though unnecessary, Christian Healthcare satisfies the *McKay*
factors, too. Michigan actively enforces the law, refuses to disavow, and
makes it easy for others to file complaints. *McKay*, 823 F.3d at 869.
While Michigan has not yet sent Christian Healthcare an enforcement
letter, this Court has found pre-enforcement standing "without any
warning letter or similar specific correspondence whatsoever." *Online
Merchs. Guild v. Cameron*, 995 F.3d 540, 551 (6th Cir. 2021) (citing
*Platt*, 769 F.3d at 452).

**Enforcement History.** Michigan actively enforces its laws.
Michigan investigated more than 12,000 complaints against employers
and public accommodations between 2011 and 2022. Compl., R.1,
PageID#44; MCRC Annual Report 30 (2022), https://perma.cc/R6J6-
BQ4D. And from May 2018 to December 2019, Michigan investigated 73
complaints alleging sexual orientation and gender identity
discrimination. Compl., R.1, PageID#44. Last year, after *Rouch World*
re-interpreted "sex," Michigan investigated 900 sex-discrimination

complaints. MCRC Annual Report 30. Michigan is also currently investigating several religious businesses and organizations. Statement of the Case, § V.

The district court required Christian Healthcare to identify exact comparators, such as past enforcement against "healthcare providers" and "a religious employer who meets the BFOQ criteria." Order, R.28, PageID#874–75; Order, R.45, PageID#1200–01. But this Court has never required plaintiffs to put forth previously prosecuted twins. A general enforcement history suffices.

Consider *Speech First, Inc. v. Schlissel*. A student group sought to engage in "protected speech" but refrained to avoid a vague university policy. 939 F.3d at 766. The university argued the students lacked standing because the policy had never been enforced against "intellectual debate" of the kind the students wanted to express. *Id.* This Court held the student group had standing. *Id.* The group didn't need to identify a prior prosecution against the student's exact speech. *Id.* It was enough to highlight "sixteen disciplinary cases" under the university's policy for conduct unrelated to protected speech. *Id.*

Or take *Block v. Canepa*. 74 F.4th 400 (6th Cir. 2023). This Court held that a wine merchant had standing to challenge an Ohio law that limited the transportation of wine. *Id.* at 404–05. Like here, the district court held that a history of enforcement against *beer* or *liquor* transportation didn't prove a credible threat to the merchant's *wine*

transportation. *Id.* at 410. This Court called that comparison analysis "flawed." *Id.* At the *summary judgment* stage, the merchant only needed to show that "Ohio *does prosecute* violations" of the law generally, not against wine specifically. *Id.*

Excusing plaintiffs from identifying historical twins is reasonable. Otherwise, Michigan could pass a law banning all communications about politics. Michigan could enforce this law against politicians. But, under Michigan's theory, a blogger could not challenge the law until Michigan enforced its law against another blogger. That makes little sense because the law covers both bloggers and politicians.

Regardless, at the pleading stage and without the benefit of discovery, Christian Healthcare has identified comparators. Michigan received a complaint against a religious healthcare provider and other religious groups and has prosecuted other medical facilities. Statement of the Case, § V; *Moon v. Mich. Reprod. & IVF Ctr., P.C.*, 810 N.W.2d 919, 921 (Mich. Ct. App. 2011) (per curiam). And Michigan always denies BFOQs for clerical positions of the kind Christian Healthcare desires to fill. *See* BFOQ Orders, R.30–4, PageID#976–77 (denying BFOQs for "support staff, clerical or maintenance personnel" and "janitorial staff, … and office personnel"). That's more than this factor requires.

At minimum, the district court should have granted Christian Healthcare's request for jurisdictional discovery. *See* Pl.'s Br. in Opp'n

to Mot. to Dismiss, R.22, PageID#651–52. It's prejudicial to require
Christian Healthcare to show an exact enforcement history at the
pleading stage, before discovery, especially when Michigan isn't even
aware of its own enforcement history. Michigan admitted it was
"unaware of the complaint" against Catholic Charities when
"Defendants' response [to the motion to reconsider] was filed." Defs.'
Resp. Br., R.37, PageID#1070 n.1. Michigan also relied on a "retired
MDCR employee" to discover "newfound information" "that current staff
was unable to locate" about its BFOQ process after originally saying it
had "no record" about prior BFOQs. Dep't Letter, R.22–4, PageID#705;
Trevino Decl., R.23–1, PageID#769. And new complaints against
religious organizations keep coming. Statement of the Case, § V.
Historical enforcement isn't necessary for standing, but Christian
Healthcare shows that history anyway. *Supra* § I.A.3. If this Court
disagrees and Michigan relies on history that only it (sometimes) knows
about, Christian Healthcare deserves discovery before dismissal.

**Disavowal.** Michigan never disavows enforcing its laws against
Christian Healthcare. Michigan argued that disavowal here "would be
impossible" "where the religious freedom inquiry would be so fact-
dependent" and where "religious freedoms must be weighed against
governmental interests." Defs.' MTD Reply, R.23, PageID#755, 758–59.
Michigan also claimed that it has "made no … determinations or issued

any guidance" about how its laws apply to Christian Healthcare's policies. Defs.' Resp., R.40, PageID#1122.

The district court concluded this cut against the ministry's standing. Order, R.28, PageID#876. Not so. Refusing to disavow *supports* standing. To effectively disavow, Michigan needed to "affirmatively and credibly" refuse to enforce its law against the ministry. *Yellen*, 54 F.4th at 340–41 & n.10 (disavowal when federal government implemented new final rule and disclaimed enforcement authority in briefing). Saying disavowal is "impossible" falls flat.

Michigan's "impossible-to-disavow" position ignores pre-enforcement basics. If adopted, Michigan could always avoid pre-enforcement suits by claiming the outcome "depends." That would, in turn, force plaintiffs to exercise their rights at the risk of prosecution. But, properly understood, this factor requires Michigan to affirmatively state its intent *not* to enforce. As one court said in a similar context, the government's admission that it "'has not to date evaluated' whether it will enforce" a law against a plaintiff "concedes that it may." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022).[3]

---

[3] *See also Wollschlaeger v. Governor*, 848 F.3d 1293, 1306 (11th Cir. 2017) (government's equivocation about law's application supported standing); *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 690 (2d Cir. 2013) (holding plaintiff had standing and rejecting argument that plaintiff "had a 'notable chance' of avoiding enforcement"); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999) (state's "promise" of non-enforcement insufficient to defeat credible threat).

Countless pre-enforcement actions bring as-applied challenges to statutes. *E.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 n.7 (2010) (considering as-applied pre-enforcement First Amendment challenge based on plaintiff's "status" and "general claims about nature of advertisements"). Those actions necessarily depend on facts. And Christian Healthcare provided more than enough facts for Michigan to take a position with a complaint, declarations, exhibits, and more. *Infra* § I.B.

For its part, the district court cited *Davis v. Colerain Township*, 51 F.4th 164 (6th Cir. 2022). But *Davis* is different. There, the plaintiff failed to show—at the summary-judgment stage—that her desired speech was "arguably proscribe[d]" by the rule she challenged. *Id.* at 172. By contrast, Michigan's laws arguably prohibit Christian Healthcare's activities and speech. *Supra* § I.A.2. So Michigan must disavow. It hasn't.

**Effortless complaints.** Michigan's laws also contain many "attribute[s]" that make "enforcement easier or more likely," *McKay*, 823 F.3d at 869, including allowing any "aggrieved" person to file complaints, MDCR Rule 37.4(1). Michigan conceded this factor. Defs.' MTD Reply, R.23, PageID#759. The district court ignored that concession because ELCRA may "be interpreted in accordance with other applicable laws." Order, R.28, PageID#875. But that is irrelevant

40

to this factor because a complaint's *possible* outcome doesn't change the fact that Michigan's laws facilitate complaints and enforcement.

Christian Healthcare established "some combination" of these factors. *McKay*, 823 F.3d at 869. The ministry has standing.

## B.    Christian Healthcare's claims are ripe on this comprehensive record.

Christian Healthcare's claims are ripe for largely the same reasons. In pre-enforcement First Amendment cases, the line between "standing and ripeness … has evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016). Both issues boil down to the same question: has Christian Healthcare "established a credible threat of enforcement?" *Id.* As described above, the "answer [here] is yes." *Id.*

The district court agreed with these principles. Order, R.28, PageID#866 n.2 (recognizing standing and ripeness analyses "lead to the same result"). But it erred in applying them.

Start with Christian Healthcare's as-applied challenges to the Publication Clause. The ministry provided *the exact statements* it wants to post, described its policies on pronouns, cross-sex hormones, and employment, and detailed each of its employment positions and why those positions must be filled with someone who shares the ministry's religious beliefs. *See* Compl., R.1, PageID#16–26, 51–55; Compl. Exs. 3–15, RR.1-5-17, PageID#116–153. In other pre-enforcement suits, the Supreme Court has held that a case is ripe when a party describes the

41

statements they would post but for the law. *E.g.*, *Milavetz, Gallop & Milavetz, P.A.*, 559 U.S. at 249 n.7; *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 458 (2007) (deciding pre-enforcement case based on template transcripts of desired advertisement). The same logic applies here.

That logic extends to Christian Healthcare's facial challenge to the Publication Clauses' ban on statements that might make someone feel "objectionable, unwelcome, unacceptable, or undesirable" at a public accommodation. *See* MCL 37.2302(b); MCL 750.147; *See* Compl., R.1, PageID#69–70. This challenge turns on the vague, overbroad, and overly discretionary text of these laws. The resolution of this issue is ripe because it presents a purely legal question. *See Hill v. Snyder*, 878 F.3d 193, 213–14 (6th Cir. 2017) ("pre-enforcement facial constitutional challenges" with "purely legal" issues are ripe).

As to Christian Healthcare's as-applied challenges to the Employment and Accommodation Clauses, the ministry has also described its activities "with plenty of detail." *Winter*, 834 F.3d at 687. The ministry provided particulars about how its religious beliefs inform its decisions to use sex-reflective pronouns, to decline to prescribe cross-sex hormones to facilitate gender transitions, and to recruit, hire, and retain employees who agree with and abide by its religious mission. *See* Compl., R.1, PageID#6–26; Compl. Exs. 1–15, RR.1–3-1–17, PageID#77–153; Blocher & Woo Decls., RR.5–2-3, PageID#180–95.

The ministry also explained how Michigan's laws threaten it. *See* Compl., R.1, PageID#26–57; Order, R.28, PageID#861–62 (detailing requested relief). Michigan never disavowed that interpretation. Nor did Michigan suggest it needed more facts. And on the facts, Christian Healthcare faces a credible enforcement threat, which proves its claims are ripe.

### C.  The district court incorrectly invoked hypothetical exemptions to reject Christian Healthcare's standing.

The district court relied on two features of Michigan's law to conclude that Christian Healthcare lacked standing: (1) vague "except where permitted by law" exemptions and (2) Michigan's BFOQ employment process. The district court ignored Christian Healthcare's claim that the Publication Clause's "objectionable, unwelcome, unacceptable, or undesirable" terms are facially unconstitutional. *See* MCL 37.2302(b); MCL 750.147. That facial challenge makes the district court's reliance on these hypothetical exemptions inapt because Christian Healthcare cannot know which portions of its policies violate this clause. *See Speech First, Inc.*, 939 F.3d at 766–67 (explaining the especially relaxed test for standing to facially challenge laws).

Aside from that, requiring Christian Healthcare to hope for or seek an exemption in the future shows that the laws apply to it now. And, given Michigan's disdain for beliefs like Christian Healthcare's, an

exemption is dubious. The district court erred in relying on these justifications.

### 1. The district court forces Christian Healthcare to hope Michigan allows it to exercise its constitutional rights.

The district court claimed that Michigan's laws do not "facially fail[ ] to recognize religious freedoms like those asserted by Plaintiff herein" and that Michigan's "statutes do not 'arguably' provide that religious freedoms will not be considered. Order, R.28, PageID#870–71; Order, R.45, PageID1198–99. It did so because Michigan's laws prohibit discrimination "[e]xcept where permitted by law" and subject "to the conditions and limitations established by law." MCL 37.2302; MCL 750.146; *see also* MCL 37.2705(1). From these vague provisions, the district court assumed that Michigan would apply its law against Christian Healthcare consistent with the First Amendment. That assumption is backwards.

For example, in *Dambrot v. Central Michigan University*, a university argued that its anti-harassment policy did not violate the First Amendment because the policy said that it would "not … interfere impermissibly with individuals rights to free speech." 55 F.3d 1177, 1183 (6th Cir. 1995). This Court rejected the university's argument. The language did "nothing to ensure the University will not violate First Amendment rights even if that is not their intention." *Id.* The policy

applied to a broad range of speech and that speech could "be prohibited upon the initiative of the university." *Id*; *accord Speech First, Inc.*, 939 F.3d at 765–67 (standing to challenge vague policy even though university alleged it had no history of disciplining "protected speech").

Other courts have concluded that plaintiffs have pre-enforcement standing to challenge laws with possible exemptions. In *Holder v. Humanitarian Law Project*, the Supreme Court held that the plaintiffs had standing to raise a First Amendment challenge to a statute. 561 U.S. 1, 15–16 (2010). The Court reached that conclusion though the statute specifically said, "'Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States.'" *Id.* at 59–60 (Breyer, J., dissenting) (quoting 18 U.S.C. § 2339B(i)).

And this Court and two circuits recently held that plaintiffs challenging vaccine policies, employment laws, and gender-identity mandates have pre-enforcement standing even when the Religious Freedom Restoration Act provides a possible exemption. *See Doster v. Kendall*, 54 F.4th 398, 416–17 (6th Cir. 2022); *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 926–27 (5th Cir. 2023); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 603–06 (8th Cir. 2022); *Franciscan All., Inc.*, 47 F.4th at 376–77.

The district court decision conflicts with these cases. Relying on someday exemptions is especially wrong here for three reasons.

45

*First*, Michigan's exemptions are multiple-times more ambiguous than the explicit guarantees in the above cases. If courts don't accept definite exemptions, this Court shouldn't accept equivocal ones.

*Second*, forcing Christian Healthcare to submit to an administrative process that *might* lead to an exemption is itself an injury. The complaint initiates "the formal investigative process, which itself is chilling *even if it does not result in a finding of responsibility or criminality*." *Speech First, Inc.*, 939 F.3d at 765 (emphasis added). And the investigation "carr[ies] an implicit threat of consequence should [Christian Healthcare] decline" to participate, *id.*, including a default judgment, MDCR Rule 37.11(6).

*Third*, Michigan has historically rejected First Amendment exemptions. There's no reason to expect Michigan will interpret its laws differently for Christian Healthcare. History shows that Michigan knows how it will enforce its laws but is staying mum here to escape review.

In briefs, Michigan rejected a potential religious exemption in *Rouch World*, claimed that a Catholic school could be forced to retain a substitute teacher who disagreed with the school's teachings, and argued that public-accommodations laws can compel artists to create custom designs that violate their beliefs. *Supra* Statement of the Case, § V. Meanwhile, Michigan is still investigating the *Rouch World*

46

plaintiffs and Catholic Charities and received a complaint against Emmaus Health even though they are all religious organizations. *Id.*

One final point. As a practical matter, all state laws must comply with the First Amendment. *See* U.S. Const. art. VI, para. 2. So the district court's logic of allowing state governments to escape pre-enforcement challenges through vague statutory provisions effectively guts all such challenges. That conclusion creates an inescapably circular argument. Christian Healthcare brought this pre-enforcement challenge to ensure the First Amendment *does* protect its activities. But Michigan dodged review by simply saying that its law *might* exempt the ministry's activities without taking an affirmative stance. So Christian Healthcare will never know for sure if its activities are exempt unless it goes through the prosecution process—the exact process pre-enforcement suits are meant to avoid.

The district court's conclusions make it equally impossible to raise a facial challenge to the Publication Clause's "objectionable, unwelcome, unacceptable, or undesirable" terms. Facial challenges recognize that a facially invalid law may have *some* valid applications. *See, e.g., Gooding v. Wilson*, 405 U.S. 518, 521 (1972). By relying on the "where permitted by law" language, the district court removed any opportunity to ever facially challenge this law because the laws' regulation may sometimes be permissible. But Christian Healthcare can't know for sure now.

47

All of that impermissibly requires Christian Healthcare to continue to chill its speech to avoid prosecution. The ministry has removed its online Membership Agreement and limited its outreach to prospective employees even though it currently has openings. Compl., R.1, PageID#49–51; Blocher Decl., R.5–2, PageID#183–86. This "chilling effect" caused by Michigan's laws "constitutes a present injury in fact" for Christian Healthcare. *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994). The district court's ruling deprives Christian Healthcare of the chance to resolve that injury.

> **2.  The district court's analysis requires Christian Healthcare to go through a BFOQ process that violates its constitutional rights and is futile.**

The district court also demanded that Christian Healthcare request a BFOQ and get denied before the ministry has standing to challenge the Employment and Publication Clauses. Order, R.28, PageID#870–71. This process is irrelevant to the ministry's standing to challenge the Accommodation Clause and its corresponding Publication Clause because the BFOQ doesn't apply to those Clauses. And the district court is also wrong.

The First Amendment guarantees a "sphere" of "independence" and "autonomy" to make "internal management decisions" about who to hire. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049,

48

2060 (2020). As a religious organization, those decisions are Christian Healthcare's "alone." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 194–95 (2012). This autonomy protects hiring decisions, *infra* § II.B.1–2, and acts as an important buffer against state entanglement with religion.

This separation applies equally to final outcomes *and* inquiries. As the Supreme Court said, "[i]t is not only the conclusions" about employment "which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *N.L.R.B. v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979). The BFOQ process is far more than an inquiry. It's a secular inquisition.

Christian Healthcare would need to hire an attorney, respond to questions for each of its positions, justify why filling those position with someone who shares the ministry's faith is "necessary," discuss "compelling reason(s) why" non-religious persons "could not reasonably perform the duties of the position," and submit a legal brief. BFOQ Application, R.22–4, PageID#703–704; Blocher Supp. Decl., R.22–3, PageID#668–72. Once submitted, Michigan has exclusive discretion to grant or deny the request. MCL 37.2208. For Christian Healthcare, that discretion authorizes Michigan to evaluate the ministry's "normal operation" and decide whether the BFOQ is "reasonably necessary" to the ministry's mission. *Id.* Michigan could launch a complaint against

49

Christian Healthcare and request "all" its "records, documents, data, or other information." MDCR Rule 37.25. Michigan can revoke any exemption within 21 days. *Id.* And Christian Healthcare would need to re-apply every five years. *Id.*

That process violates Christian Healthcare's First Amendment freedoms three-times over.

It allows Michigan to "troll[] through the [ministry's] beliefs …, making determinations about its religious mission and whether certain [employees] contribute to that mission." *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 835 (D.C. Cir. 2020) (citation omitted).

It gives Michigan authority to grant individualized exceptions. *See Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1877 (2021) (individualized exemptions violate the First Amendment).

And it acts as a prior restraint on Christian Healthcare's speech. Michigan said that the ministry cited no cases "prohibiting a religious employer who meets the BFOQ criteria from" asking employees about their religion or posting employment opportunities discussing religion. Defs.' MPI Resp., R.18, PageID#510. But that's the point—only by obtaining a BFOQ can Christian Healthcare speak about its beliefs with prospective and existing employees. That acts as a prior restraint on constitutionally protected speech by forcing Christian Healthcare to request a BFOQ and refrain from speaking until Michigan decides whether the position qualifies. *City of Lakewood v. Plain Dealer Publ'g*

*Co.*, 486 U.S. 750, 757 (1988) (prohibiting "prior restraint[s]" resulting from "unbridled discretion" of government officials).

Christian Healthcare need not violate its own constitutional rights just to vindicate them. That's nonsensical. As this Court has held, plaintiffs "do[] not need to proceed through [an] allegedly invalid process to challenge the policy in court," and they can "challenge a religiously discriminatory policy without receiving a formal denial." *Doster*, 54 F.4th at 416–17.

Setting aside these constitutional infirmities, applying for BFOQs would be futile. Based on the current record, in the history of Michigan, no medical ministry has *ever* received a religious BFOQ. *See* BFOQ Decisions, RR.23–1, 30–4, PageID#772–800, 967–1004. Even in the rare circumstances when Michigan has granted a religious BFOQ, Michigan has withheld the exemption for positions like "support staff, clerical or maintenance personnel" "janitorial staff, physical education teacher and office personnel." *Id.*, PageID#796, 977. Yet Christian Healthcare's ministry depends on all its staff affirming its religious values. Compl., R.1, PageID#16–26. So the BFOQ process wouldn't even give the ministry full relief.

In concluding that the BFOQ process eliminated Christian Healthcare's standing, the district court relied on several Michigan state court cases involving the ministerial exception and religious schools. Order, R.28, PageID#870. But those decisions *support*

Christian Healthcare's standing. They show that the Employment
Clause facially applies to religious employers like Christian Healthcare.
And those decisions show that parties disputed whether the ministerial
exception applied to those schools, which necessitated court
intervention. So too here. Michigan has never confirmed that Christian
Healthcare's positions are entitled to BFOQs. So Christian Healthcare
has requested court intervention to confirm that the First Amendment
protects the ministry's freedom to select employees who share its
religious beliefs.

## II.    Christian Healthcare is entitled to a preliminary injunction because it is likely to succeed on the merits.

Christian Healthcare deserves a preliminary injunction because
the basis for the district court's denial of that motion—lack of
standing—was incorrect. *See* Order, R.28, PageID#877. This Court may
issue that relief in the first instance because "injustice might otherwise
result" from delaying review. *Hormel v. Helvering*, 312 U.S. 552, 557
(1941). Christian Healthcare meets that standard here where it will be
forced to continue to chill its speech and delay its hiring process to avoid
prosecution absent an injunction. *Supra* Statement of the Case, § VII.

Christian Healthcare meets each preliminary-injunction factor.
The ministry likely brings successful claims because Michigan's law (A–
B) compels and restricts speech; (C) violates the ministry's religious
autonomy; (D) lacks general applicability; and (E) triggers, but fails,

strict scrutiny. And because likelihood of success is the "crucial" factor, Christian Healthcare necessarily meets the other factors here. *Bays v. City of Fairborn*, 668 F.3d 814, 819, 825 (6th Cir. 2012). Put simply, the loss of constitutional rights causes irreparable harm and it is always in the public interest to protect constitutional rights. *Id.* (noting other factors easily met in free speech case after determining likelihood of success). So this Court should grant injunctive relief.

### A.    The Accommodation Clause compels Christian Healthcare to convey a message about gender-identity it disagrees with through pronouns.

The Accommodation Clause compels Christian Healthcare to contradict its religious beliefs about the immutability of sex by referring to patients with pronouns that reflect their self-asserted gender identity rather than sex. *Supra* § I.A.2. But Michigan "may not compel a person to speak [the state's] own preferred messages" about gender identity. *303 Creative LLC*, 600 U.S. at 586. The Accommodation Clause violates this principle here.

Pronouns "convey a powerful message implicating a sensitive topic of public concern"—gender identity. *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). Christian Healthcare communicates its view that God created humankind as "male and female" by only referring to its patients using sex-reflective pronouns. *See* Compl., R.1, PageID#16–

17. The ministry's language choice reflects "its conviction that one's sex cannot be changed." *Meriwether*, 992 F.3d at 508.

By forcing Christian Healthcare to speak pronouns based on a patient's gender identity—and therefore confirm a view about the immutability of sex that conflicts with its religious beliefs—the Accommodation Clause compels the ministry's speech. *303 Creative LLC*, 600 U.S. at 586 (government compels speech when it "force[s] an individual to include other ideas within his own speech that he would prefer not to include"). This Court already said as much in *Meriwether*.

There, a university required professors to address students using their gender-identity-based pronouns. *Meriwether*, 992 F.3d at 498. One professor objected because of his religious "conviction that one's sex cannot be changed." *Id.* at 508. The university punished him. *Id.* at 502. The punishment compelled him to express a view about gender identity that he opposed through pronoun usage. *Id.* at 506–07. This Court held this violated the First Amendment. So too here.

## B.    The Publication Clause censors Christian Healthcare's religiously motivated speech based on content and viewpoint.

The Publication Clause restricts Christian Healthcare's speech about its services, policies, and employment decisions based on content and viewpoint.

A law is content-based when it "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law is content- or viewpoint- based if it "cannot be justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* at 164 (cleaned up). The Publication Clause fails these standards on its face and as applied.

Christian Healthcare cannot say that it only uses sex-based pronouns or refuses cross-sex hormones consistent with its faith because that might "indicate[ ]" a denial of "equal enjoyment." MCL 37.2302(b); MCL 750.147; Compl., R.1, PageID#54–55, Compl. Ex. 3, R.1–5, PageID#112–20. Nor can it describe its religiously motivated care to prospective patients as that might make them feel "unwelcome." MCL 37.2302(b); MCL 750.147 (same). Nor can the ministry communicate its desire to recruit, hire, and retain employees who share its religious beliefs because that would "indicate[] a preference" based on religion. Compl., R.1, PageID#16–26; MCL 37.2206(1)–(2).

But Christian Healthcare could speak without restraint if it *affirmed* gender-identity-based pronouns or *prescribed* cross-sex hormones. So can Christian Healthcare speak freely on any other topics not regulated by the Publication Clause. The restriction "depend[s] entirely on the communicative content of the" speech and Christian

Healthcare's particular viewpoint. *Reed*, 576 U.S. at 164. By singling out disfavored speech, the Publication Clause is unconstitutional.

### C. Michigan's laws violate Christian Healthcare's religious autonomy by dictating employment decisions and controversial medical procedures.

The First Amendment's Free Exercise and Establishment Clauses protect religious autonomy. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871). Religious autonomy recognizes the "independence" of religious organizations "in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 140 S. Ct. at 2061. This Court and others have sensibly applied this autonomy to protect religious medical providers. *E.g.*, *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 626 (6th Cir. 2000); *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416 (2d Cir. 2018). This autonomy protects such providers' decisions about employment and about medical services that directly touch on their religious tenets.

But Michigan's laws infringe on Christian Healthcare's religious autonomy by (1) interfering with the ministry's selection of ministerial employees; (2) prohibiting the ministry from preferring to hire non-ministerial co-religionists; and (3) forcing the ministry to prescribe cross-sex hormones contrary to its religious beliefs. The First Amendment categorically bars this intrusion. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 196; Lael Weinberger, *The Limits of Church Autonomy*, 98

Notre Dame L. Rev. 1253, 1286 (2023) ("The courts have rejected balancing tests in the church autonomy cases.").

     1.    **Michigan's laws violate Christian Healthcare's religious autonomy by forcing it to hire ministerial employees who don't share its faith.**

The Employment and Publication Clause violate the ministerial exception by interfering with Christian Healthcare's ability to recruit, hire, and retain employees in ministerial positions.

The ministerial exception applies to employment decisions by (1) religious institutions about (2) "ministerial employee[s]." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015). If those two criteria are met, the government may not interfere with the decision. *Hosanna-Tabor*, 565 U.S. at 194–95. Consider each step here.

*First*, Christian Healthcare is a religious institution. No one disputes this. *See* Order, R.28, PageID#859–60 (recognizing Christian Healthcare's religious purpose). The complaint confirms it. Compl., R.1, PageID#6–19.

*Second*, the ministry's Managers, the Medical Director, the Advance Practice Medical Providers, and Biblical Counselors hold ministerial positions. There is no "rigid formula" for determining whether a position qualifies as ministerial. *Our Lady*, 140 S. Ct. at 2062. But courts consider an employee's role in "conveying" the organization's "message and [in] carrying out its mission," in teaching

about the faith, "inculcating [the faith's] teaching" in others, and "training [others] to live their faith." *Id.* at 2062, 2064.

These positions are ministerial. The Managers set ministry policies, approve external communications, and ensure Christian Healthcare operates consistent with its faith. Compl., R.1, PageID#19–20. The Medical Director integrates the ministry's religious beliefs into its medical care and ensures medical staff provide care consistent with those beliefs. *Id.*, PageID#21–24. The Medical Director, Advanced Practice Medical Providers, and Biblical Counselors provide medical treatment and counseling services consistent with Christian Healthcare's religious views and are expected to communicate those views to members through prayer or spiritual advice. *Id.*

*Finally*, Michigan's laws interfere with Christian Healthcare's employment decisions by prohibiting the ministry from recruiting, hiring, and retaining ministerial employees who agree with the ministry's religious beliefs. *See* MCL 37.2202(1); MCL 37.2206(1)–(2); MCL 37.2302(a). So Christian Healthcare cannot fill those positions with employees who share the ministry's vision and values even though that is necessary for the ministry's survival. Compl., R.1, PageID#16–19, 29–33; Compl. Exs. 4–12, RR.1–6-1–14, PageID#121–43. This interference violates the ministerial exception by infringing on Christian Healthcare's selection of vital employees to lead the ministry.

> **2.    Michigan's laws interfere with Christian Healthcare's religious autonomy by dictating non-ministerial employee decisions.**

The Employment and Publication Clauses also violate Christian Healthcare's religious autonomy by interfering with its faith-based hiring practice for its *non*-ministerial employees.

Christian Healthcare depends on and expects its non-ministerial employees to communicate the religious values of the ministry and to put that faith in action in how they treat other employees, prospective members, current members, and the public. Compl., R.1, PageID#16–26. Christian Healthcare recognizes what is commonly understood: "employees play a crucial role in preserving and transmitting—or undermining—institutional ideas and norms." Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe School*: Too Broad? Or Broad As It Needs to Be?*, 25 Tex. Rev. L. & Pol. 319, 354 (2021). To clarify its expectations, Christian Healthcare requires its employees to reaffirm their religious commitment each year. Compl., R.1, PageID#17.

Most states and the federal government have statutory co-religionist exemptions that ensure religious organizations can hire employees who share their beliefs. *See* 42 U.S.C.A. § 2000e-1(a); State Survey, R.5–8, PageID#335–37. In those cases, courts understand the statutory exemptions to be at least co-extensive with the co-religionist exception. *See, e.g.*, *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013)

("The religious-employer exemptions in [two federal laws] are legislative applications of the church-autonomy doctrine.").

Michigan's law lacks such an exemption. So the First Amendment's co-religionist exception fills this void. This exception recognizes that religious groups have a "constitutionally-protected interest … in making religiously motivated employment decisions." *Hall*, 215 F.3d at 623. And this exception prevents Michigan from "dictat[ing] to" Christian Healthcare "how to carry out [its] religions mission[] or how to enforce [its] religious practices." *Id.* at 626.

But the "because of" language in the Employment Clause and the "indicate" a preference language in the Publication Clause prohibit Christian Healthcare's practices as applied to non-ministerial employees and forces the ministry to Christian Healthcare to recruit, hire, and retain employees who do not share its religious values. MCL 37.2202(1)–(2); MCL 37.2206(2). Michigan has always denied BFOQ requests for non-ministerial employees. *See* BFOQ Orders, R.30–4, PageID#976–77 (denying BFOQs for "support staff, clerical or maintenance personnel" and "janitorial staff, … and office personnel"). By preventing the ministry from hiring co-religionist employees, Michigan's laws violate the First Amendment.

### 3. Michigan's laws violate Christian Healthcare's religious autonomy by forcing it to provide medical treatment contrary to its beliefs.

The Accommodation Clause also violates Christian Healthcare's religious autonomy by forcing it to provide medical treatment inconsistent with its religious belief that sex cannot be changed. This Clause forces Christian Healthcare to prescribe cross-sex hormones to facilitate gender transitions because the ministry would prescribe those hormones for other medically indicated reasons. *Supra* § I.A.2.

By doing so, the law requires Christian Healthcare to redirect its medical care to facilitate gender transitions contrary to its religious beliefs. This usurps one of the "internal management decisions" that is "essential to the … central mission" of Christian Healthcare—providing excellent healthcare consistent with its faith. *Our Lady*, 140 S. Ct. at 2060. Religious autonomy covers faith-based healthcare ministries' decisions over medical services that "are inextricably intertwined with … religious tenets" because those decisions are part in parcel of "ecclesiastical rule, custom, or law" questions. *Means v. U.S. Conf. of Cath. Bishops*, 2015 WL 3970046, at *12–13 (W.D. Mich. 2015), *aff'd on other grounds*, 836 F.3d 643 (6th Cir. 2016).

For example, legislatures rushed to pass conscience laws right after the first systematic threat to religious autonomy in medicine appeared—*Roe v. Wade*, 410 U.S. 113 (1973). *See* 42 U.S.C.A. § 300a-7; *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 312 (9th Cir.

1974). Today, states have laws that authorize health facilities, physicians, and other medical staff to decline certain medical treatment (including abortions, sterilizations, and physician-assisted suicide) if it violates their religious beliefs. State Survey, R.5–8, PageID#320–33. And many medical codes of ethics acknowledge the importance of preserving conscience objections, particularly for non-emergent and sterilizing treatment like prescribing cross-sex hormones for gender transitions. *See* Med. Codes of Ethics, RR.5–7, 5–8, PageID#299–319.

The Accommodation Clause ignores all of this and targets the ministry's policy and practice of declining to alter a patient's sex. That coercion intrudes on the ministry's religious autonomy.

### D.   The Employment Clause lacks general applicability and violates Christian Healthcare's free exercise.

The Employment Clause applies to Christian Healthcare but lacks general applicability. The Employment Clause is not generally applicable because the BFOQ process creates a "mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up). Through this process, Michigan "may grant an exemption" "[u]pon sufficient showing." MCL 37.2208. Michigan considers many criteria when exercising its discretion to grant an exemption. *See* BFOQ Application, R.22–4, PageID#703–04. And there are myriad reasons why Michigan might deny a requested BFOQ. *See* BFOQ Decisions, RR.23–1, 30–4, PageID#772–800, 967–1004 (documenting denials). These loose

standards are nearly identical to the "sole discretion" standard that created individualized exemptions in *Fulton*, 141 S. Ct. at 1878. For that reason, the Employment Clause lacks general applicability.

### E.    Michigan's laws fail strict scrutiny.

Michigan's laws are subject to strict scrutiny because they compel and restrict Christian Healthcare's speech and violate its religious exercise. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (compelled speech); *Reed*, 576 U.S. at 164–65 (restricted speech); *Fulton*, 141 S. Ct. at 1881 (religious exercise). Michigan must prove its laws are narrowly tailored to serve a compelling interest as applied to Christian Healthcare. *See Reed*, 576 U.S. at 163. It can't.

Michigan might claim an interest in ending discrimination. But that interest cannot justify compelling Christian Healthcare to use pronouns or prescribe cross-sex hormones contrary to its religious beliefs. Christian Healthcare already serves members who identify as LGBT. Nor can that interest justify forcing Christian Healthcare to hire employees who do not share its religious beliefs. Michigan's BFOQ exemptions undermine any reason to dictate the ministry's employment decisions because it reveals Michigan's anti-discrimination interest in the employment context cannot really be compelling. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011) ("Underinclusiveness raises serious doubts about" government's interests and "is alone enough" to fail strict scrutiny.).

Next, Michigan's laws are not narrowly tailored because Michigan cannot prove that regulating Christian Healthcare is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Looking to other jurisdictions proves the point. *See Ramirez v. Collier*, 595 U.S. 411, 428 (2022) (other states' practices showed Texas "ban on audible prayer" not narrowly tailored). Most states and the federal government allow religious organizations to hire employees who share its faith. 42 U.S.C.A. § 2000e-1(a); State Survey, R.5–8, PageID#335–37. Many states also exempt religious providers from providing non-emergent, controversial, and sterilizing medical treatment—like cross-sex hormones. State Survey, R.5–8, PageID#320–33 (listing and summarizing state laws). Michigan has done none of this. So the laws fail narrow tailoring.

## CONCLUSION

Christian Healthcare wants to speak and operate its ministry right now consistent with its beliefs. But it cannot because of Michigan's laws. The ministry shouldn't be forced to hope that Michigan *might* grant it an exemption at the end of an arduous administrative process, especially where Michigan has routinely been openly hostile towards religious exemptions. This dispute is ripe for court intervention now. And this Court should intervene to reinstate Christian

Healthcare's case, hold the ministry has standing, and preliminary enjoin Michigan from enforcing its laws against the ministry.

Dated: October 18, 2023

Respectfully submitted,

*s/John J. Bursch*

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Jonathan A. Scruggs
Bryan D. Neihart
Henry W. Frampton, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org
hframpton@ADFlegal.org

*Counsel for Appellants*

**FRAP 32(g)**

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,953 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: October 18, 2023

*s/John J. Bursch*
John J. Bursch
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/John J. Bursch*
John J. Bursch
*Counsel for Appellants*

**ADDENDUM**

# DESIGNATION OF RELEVANT
# DISTRICT COURT DOCUMENTS

Under Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g), Appellant

Christian Healthcare Centers, Inc. designates the following district

court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| 1 | Verified Complaint | 1–73 |
| 1–2 | Index of Exhibits to Verified Complaint | 76 |
| 1–3 | Exhibit 1 to Complaint – Christian Healthcare, Inc. Articles of Organization | 77–86 |
| 1–4 | Exhibit 2 to Complaint – Selected Blog Posts from Christian Healthcare Website | 87–110 |
| 1–5 | Exhibit 3 to Complaint – Membership Agreement with Appendices | 111–120 |
| 1–6 | Exhibit 4 to Complaint – Statement of Faith | 121–122 |
| 1–7 | Exhibit 5 to Complaint – Statement of Values | 123–124 |
| 1–8 | Exhibit 6 to Complaint – Affirmation on Marriage and Human Sexuality | 125–126 |
| 1–9 | Exhibit 7 to Complaint – Code of Conduct | 127–128 |
| 1–10 | Exhibit 8 to Complaint – Physician Job Description | 129–131 |
| 1–11 | Exhibit 9 to Complaint – Medical Director Job Description | 132–134 |

| 1–12 | Exhibit 10 to Complaint – Director of Operations Job Description | 135–137 |
|---|---|---|
| 1–13 | Exhibit 11 to Complaint – Advanced Practice Provider Job Description | 138–140 |
| 1–14 | Exhibit 12 to Complaint – Biblical Counselor Job Description | 141–143 |
| 1–15 | Exhibit 13 to Complaint – Member Services Coordinator Job Description | 144–146 |
| 1–16 | Exhibit 14 to Complaint – Member Services/Reception Job Description | 147–149 |
| 1–17 | Exhibit 15 to Complaint – Employment Application | 150–153 |
| 5 | Plaintiff's Preliminary Injunction Motion | 170–175 |
| 5–2 | Declaration of Mark Blocher in Support of Plaintiff's Preliminary Injunction Motion | 180–187 |
| 5–3 | Declaration of Jeffrey Woo, M.D. in Support of Plaintiff's Preliminary Injunction Motion | 188–195 |
| 5–4 | Declaration of Jonathan A. Scruggs in Support of Plaintiff's Preliminary Injunction Motion | 196–198 |
| 5–5 | Table of Contents: Appendix to Plaintiffs' Brief in Support of Plaintiffs' Preliminary Injunction Motion | 200 |
| 5–5 | Appendix Part 1 in Support of Plaintiff's Preliminary Injunction Motion | 199–219 |
| 5–6 | Appendix Part 2 in Support of Plaintiff's Preliminary Injunction Motion | 220–243 |

| 5–7 | Appendix Part 3 in Support of Plaintiff's Preliminary Injunction Motion | 244–312 |
|---|---|---|
| 5–8 | Appendix Part 4 in Support of Plaintiff's Preliminary Injunction Motion | 313–343 |
| 6 | Appendix Part 5 in Support of Plaintiff's Preliminary Injunction Motion | 344–361 |
| 6–1 | Appendix Part 6 in Support of Plaintiff's Preliminary Injunction Motion | 362–371 |
| 6–2 | Appendix Part 7 in Support of Plaintiff's Preliminary Injunction Motion | 372–390 |
| 6–3 | Appendix Part 8 in Support of Plaintiff's Preliminary Injunction Motion | 391–404 |
| 7 | Plaintiff's Brief in Support of Its Preliminary Injunction Motion | 405–456 |
| 18 | Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary Injunction | 487–529 |
| 19 | Defendants' Motion to Dismiss | 538–541 |
| 20 | Defendants' Brief in Support of Motion to Dismiss | 542–585 |
| 22 | Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss and Reply Brief in Support of Its Preliminary Injunction Motion | 597–660 |
| 22–1 | Bryan D. Neihart's Declaration in Support of Plaintiff's Appendix to Opposition to Defendants' Motion to Dismiss | 661–663 |
| 22–2 | Jessica Hoff's Declaration in Support of Plaintiff's Appendix to Opposition to Defendants' Motion to Dismiss | 664–666 |

| 22–3 | Mark Blocher's Declaration in Support of Plaintiff's Appendix to Opposition to Defendants' Motion to Dismiss | 667–673 |
|---|---|---|
| 22–4 | Table of Contents: Plaintiffs' Appendix to Opposition to Defendants' Motion to Dismiss and Reply Brief in Support of its Preliminary Injunction | 674 |
| 22–4 | Plaintiff's Appendix to Opposition to Defendants' Motion to Dismiss | 675–745 |
| 23 | Reply Brief in Support of Motion to Dismiss | 746–768 |
| 23–1 | Declaration of Marcelina Trevino with BFOQ Letters | 769–800 |
| 26 | Notice of Supplemental Authority in Support of Plaintiff's Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss | 806–812 |
| 26–1 | Exhibit A – Statement of Michigan Attorney General on Proposed Expansion of Elliott-Larsen Civil Rights Act | 813–816 |
| 26–2 | Exhibit B – Michigan Civil Rights Commission Resolution in Support of Amending Elliott-Larsen Civil Rights Act | 817–820 |
| 26–3 | Exhibit C – Civil Rights Commission Organization, Practice and Procedure Rules | 821–830 |
| 26–4 | Exhibit D – Regulatory Impact Statement and Cost Benefit Analysis | 831–845 |
| 28 | Opinion and Order Granting Motion to Dismiss | 854–877 |
| 29 | Judgment | 878 |

| 30 | Plaintiff's Motion for Reconsideration | 879–889 |
|---|---|---|
| 30–1 | Bryan D. Neihart's Declaration in Support of Plaintiff's Motion for Reconsideration | 890–893 |
| 30–2 | Jessica Hoff's Declaration in Support of Plaintiff's Motion for Reconsideration | 894–895 |
| 30–3 | Table of Contents: Plaintiff's Appendix in Support of Plaintiff's Motion for Reconsideration | 896 |
| 30–4 | Appendix in Support of Plaintiff's Motion for Reconsideration | 897–1004 |
| 35 | Plaintiff's Motion for Leave to File Supplemental Brief and Evidence in Support of Motion for Reconsideration | 1039–1043 |
| 35–1 | Plaintiff's Supplemental Brief and Evidence in Support of Motion for Reconsideration | 1044–1050 |
| 35–2 | Exhibit A to Plaintiff's Supplemental Brief – Catholic Charities Notice of Certified Complaint May 3, 2023 | 1051–1059 |
| 37 | Defendants' Response in Opposition to Plaintiff's Motion for Leave to File Supplemental Brief and Evidence in Support of Motion for Reconsideration | 1064–1075 |
| 39 | Plaintiff's Notice of Supplemental Authority re *Braidwood Management, Inc. v. EEOC* | 1088–1094 |
| 41 | Plaintiff's Notice of Supplemental Authority re *303 Creative v. Elenis* | 1124–1132 |
| 43 | Plaintiff's Notice of Supplemental Authority re *Block v. Canepa* | 1171–1176 |

| 45 | Memorandum Opinion and Order denying Motion for Reconsideration | 1193–1205 |
|----|-----------------------------------------------------------------|-----------|
| 46 | Notice of Appeal                                                 | 1206–1208 |
| 47 | Letter from Court of Appeals assigning case number               | 1209–1211 |