No. 23-1769

# In the United States Court of Appeals for the Sixth Circuit

CHRISTIAN HEALTHCARE CENTERS, INC.,
Plaintiff-Appellant,
v.
DANA NESSEL, *et al.*,
Defendants-Appellees.

On Appeal from U.S.D.C.,
W.D. Mich., So. Div., No. 1:22-cv-00787

**BRIEF *AMICUS CURIAE* OF BILLY GRAHAM
EVANGELISTIC ASSOCIATION, SAMARITAN'S PURSE,
CONCERNED WOMEN FOR AMERICA, THE FAMILY
FOUNDATION, ILLINOIS FAMILY INSTITUTE,
INTERNATIONAL CONFERENCE OF EVANGELICAL
CHAPLAIN ENDORSERS, PACIFIC JUSTICE INSTITUTE,
and THE NATIONAL LEGAL FOUNDATION**
*in support of Plaintiff-Appellant
and supporting reversal*

Steven W. Fitschen
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

Frederick W. Claybrook, Jr.
Counsel of Record
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3822
rick@claybrooklaw.com

Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

None of the *Amici Curiae* have issued shares to the public, and none have a

parent company, subsidiary, or affiliate that has issued shares to the public. Thus,

no publicly held company can own more than 10% of stock of any *Amicus Curiae*.

Table of Contents

TABLE OF AUTHORITIES ...................................................... ii

STATEMENTS OF INTEREST ................................................1

SUMMARY OF ARGUMENT ................................................4

ARGUMENT ......................................................................5

I.  The District Court Underestimated the Likelihood of an Enforcement
    Action Against Christian Healthcare .............................................5

II.  The Religion Clauses Prohibit Governmental Personnel from Interfering
     with a Religious Organization's Good-Faith Determination of Which
     Employees Must Conform to the Organization's Religious Beliefs and
     Practices for It to Carry Out Its Ministry Purposes ......................12

III.  Christian Healthcare's Religion-Infused Mission, Hiring Practices,
      and Ways of Working Across the Breadth of Its Workforce Demands
      Application of the "Ministerial Exception"................................15

IV.  Application of the First Amendment Requires Entry of a Preliminary
     Injunction Barring Michigan from Enforcing Its Statutes with Respect to
     Employment Decisions of Christian Healthcare ..........................18

CONCLUSION ...................................................................20

Table of Authorities

**Cases**

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023) ...................................................8

*Babbitt v. Farm Workers Nat'l Union,* 442 U.S. 289 (1979)................................. 6-7

*Buck v. Gordon,* 429 F. Supp. 3d 447 (W.D. Mich. 2019) ........................................10

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2014) ...............................................6

*Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829 (6th Cir. 2015) ..15

*Franciscan Alliance, Inc. v. Bacerra*, 47 F.4th 368 (5th Cir. 2022) .......................11

*Golden v. Zwickler*, 394 U.S. 103 (1969) ...................................................................6

*Hollins v. Methodist Healthcare, Inc.,* 474 F.3d 223 (6th Cir. 2007),
    abrogated on other grounds by Hosanna-Tabor ......................................... 15-16

*Hosanna-Tabor Evan. Lutheran Church and Sch. v. EEOC,*
    565 U.S. 171 (2012)............................................................2, 4-5, 12, 14-15, 19

*Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952) ............................... 13-14, 19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................5

*Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270 (1941) ....................................7

*Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n*,
    138 S. Ct. 1719 (2018).......................................................................................11

*O'Shea v. Littleton,* 414 U.S. 488 (1974).................................................................6

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020).................................................................4-5, 13-14, 19

*Parents Involved in Community Schools v. Seattle School District No. 1,*
    551 U.S. 701, 718 (2007).....................................................................................6

*Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416 (2d Cir. 2018) ...................................15

*Religious Sisters of Mercy v. Bacerra*, 55 F.4th 583 (8th Cir. 2022) ......................11

*Scardina v. Masterpiece Cakeshop Ltd.*, 2023 COA 8 (Colo. Ct. App. 2023) .......11

*Serbian Orthodox Diocese vs. Milivojevich*, 426 U.S. 696 (1976) .........................13

*Steffel v. Thompson,* 415 U.S. 452 (1974).................................................................6

*Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014)....................................6, 8

*Watson v. Jones*, 80 U.S 679 (1871)........................................................... 13-14, 19

## Statutes

Michigan Civil Law § 37.2202(1)(a) ......................................................................18

Mich. Comp. Laws § 37.2602.................................................................................9

Mich. Comp. Laws § 37.2801.................................................................................8

## Other Authorities

https://www.michigan.gov/mdcr/commission/meet ...................................................8

https://en.wikipedia.org/wiki/Dana_Nessel ............................................................9

Statements of Interest[1]

The **Billy Graham Evangelistic Association** (BGEA) was founded by Billy Graham in 1950 and, continuing the lifelong work of Billy Graham, exists to support and extend the evangelistic calling and ministry of Franklin Graham by proclaiming the Gospel of the Lord Jesus Christ to all we can by every effective means available to us and by equipping the church and others to do the same. BGEA ministers to people around the world through a variety of activities including God Loves You Tour events, evangelistic festivals and celebrations, television and internet evangelism, the Billy Graham Rapid Response Team, the Billy Graham Training Center at the Cove, the Billy Graham Library, and the Billy Graham Archive & Research Center. Through its various ministries and in partnership with others, BGEA intends to represent Jesus Christ in the public square; to cultivate prayer, and to proclaim the Gospel. BGEA believes its mission to be primarily a spiritual endeavor and further believes that, to fulfill its mission, its employees must share its religious beliefs and acknowledge that those beliefs are put into action through their employment with BGEA in pursuit of its religious mission and objectives.

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity other than *Amici* and its counsel made a monetary contribution intended to fund the preparation or submission of this brief. Appellant has consented to the filing of this Brief. Appellees have not, and a motion for leave to file the Brief accompanies it.

1

**Samaritan's Purse** is a nondenominational, evangelical Christian organization formed in 1970 to provide spiritual and physical aid to hurting people around the world. The organization seeks to follow the command of Jesus to "go and do likewise" in response to the story of the Samaritan who helped a hurting stranger. Samaritan's Purse operates in over 100 countries providing emergency relief, community development, vocational programs and resources for children, all in the name of Jesus Christ. Samaritan's Purse's concern arises when government hostility prevents persons of faith from practicing core aspects of faith such as prayer, discipleship, evangelism, acts of charity for those in need, or other day-to-day activities of those practicing their sincerely held religious beliefs.

**Concerned Women for America** (CWA) is the largest public policy organization for women in the United States, with approximately half a million supporters from all 50 States. Through its grassroots organization, CWA encourages policies that strengthen women and families and advocates for the traditional virtues that are central to America's cultural health and welfare, including religious liberties. CWA actively promotes legislation, education, and policymaking consistent with its philosophy. Its members are people whose voices are often overlooked—everyday American women whose views are not represented by the powerful elite.

**The Family Foundation** (TFF) is a Virginia non-partisan, non-profit organization committed to promoting strong family values and defending the sanctity of human life in Virginia through its citizen advocacy and education. TFF serves as the largest pro-family advocacy organization in Virginia. Its interest in this case is derived directly from its concern to preserve religious freedom for all.

The **Illinois Family Institute** (IFI) is a nonprofit educational and lobbying organization based in Tinley Park, Illinois, that exists to advance life, faith, family, and religious freedom in public policy and culture from a Christian worldview. A core value of IFI is to uphold religious freedom and conscience rights for all individuals and organizations.

The **International Conference of Evangelical Chaplain Endorsers** (ICECE) has as its main function to endorse chaplains to the military and other organizations requiring chaplains that do not have a denominational structure to do so, avoiding the entanglement with religion that the government would otherwise have if it determined chaplain endorsements. ICECE safeguards religious liberty for all.

The **Pacific Justice Institute** (PJI) is a non-profit legal organization established under section 501(c)(3) of the Internal Revenue Code. Since its founding in 1997, PJI has advised and represented in court and administrative proceedings thousands of individuals, businesses, and religious institutions,

particularly in the realm of First Amendment rights. As such, PJI has a strong interest in the development of the law in this area.

The **National Legal Foundation** (NLF) is a public interest law firm dedicated to the defense of First Amendment liberties and the restoration of the moral and religious foundation on which America was built. The NLF and its donors and supporters, including those in Michigan, seek to ensure that an historically accurate understanding of the Religion Clauses is presented to our country's judiciary. Those Clauses are at the heart of the instant case.

Summary of Argument

The Supreme Court in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012), and *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), established that religious institutions have a constitutional right to hire and retain only those employees who share their core religious beliefs. This doctrine, founded on church autonomy principles, is known as the "ministerial exception" and has been broadly applied to all religious institutions, including those involved in health care.

The district court improperly dismissed this case on standing grounds, denying the religious hospital's request for injunctive relief despite the very real risk that Michigan's recently revised civil rights laws will be used against it to challenge its hiring decisions based on its religious principles. After addressing the

4

court's misapplication of standing law, your *Amici* will show that a straightforward

application of *Hosanna-Tabor* and *Our Lady of Guadalupe* requires injunctive

relief for Christian Healthcare.

Argument

I.    The District Court Underestimated the Likelihood
      of an Enforcement Action Against Christian Healthcare

The district court's application of standing law ignores the most relevant

precedent and comes to the wrong conclusion. The Supreme Court has instructed,

> When the suit is one challenging the legality of government action
> or inaction, standing depends considerably upon whether the
> plaintiff is himself an object of the action (or forgone action) at
> issue. If he is, there is ordinarily little question that the action or
> inaction has caused him injury, and that a judgment preventing or
> requiring the action will redress it.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). That is exactly the

situation in which Christian Healthcare finds itself.

Michigan recently amended its civil rights laws to add gender identity and

sexual orientation, targeting employers who discriminate on that basis. Mot. for

Recon., R. 30, Page ID # 881. That Christian organizations do so is no surprise (in

that word's neutral, denotative sense). As Christian Healthcare has explained, when

the Michigan legislature added those categories, it expressly declined to add an

exception for religious institutions, as the legislators recognized that it was those

institutions who would likely run afoul of the provisions. (Mot. for Recon., R. 30,

5

Page ID # 881-883. Thus, Christian Healthcare is a targeted organization, and obviously so.

When a plaintiff is the target of the government action, it is not enough to say, as the district court below basically did, that an enforcement action *might* not be brought against the plaintiff. It is sufficient that it *may* be. *See, e.g.*, *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 718 (2007) (finding standing when a policy "may be" applied in the future to plaintiff). A credible threat of future enforcement is sufficient so long as the threat is not "imaginary or wholly speculative," *Babbitt v. Farm Workers Nat'l Union,* 442 U.S. 289, 302 (1979), "chimerical," *Steffel v. Thompson,* 415 U.S. 452, 459 (1974), "wholly conjectural," *Golden v. Zwickler*, 394 U.S. 103, 109 (1969), or relying on "a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2014). The Supreme Court has further explained that the most obvious way to demonstrate a credible threat of enforcement in the future is an enforcement action in the past. *See Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 164 (2014); *O'Shea v. Littleton,* 414 U.S. 488, 496 (1974)). And the threat of government use of a challenged statute or policy is especially credible when defendants have not "disavowed enforcement." *Driehaus*, 573 U.S. at 165-66.

While a chain of assumed events may become too attenuated, *all* forward-looking, injunctive cases, by definition, involve some chain of possibilities ending

in the challenged provision "may be" applied against the plaintiff. For example, in *Babbitt* the Supreme Court found standing by assuming that the plaintiff would (a) engage in publicity and (b) inadvertently state an untruth (c) that would be apprehended as such by state authorities (d) who would bring charges (even though they had never done so before). 442 U.S. at 301-02. The Court found the plaintiffs in that situation were "not without some reason" to fear application of the challenged statute, such that the positions of the parties [we]re sufficiently adverse . . . to present a case or controversy . . . ." *Id.* at 302. "The difference between an abstract question and a 'case or controversy' is one of degree." *Id.* at 297-98; *see also Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

The district court also relied on the facts that, in the past, plaintiffs challenging the application of Michigan's civil rights laws on free exercise grounds had pursued their constitutional rights in court and that the Michigan authorities concede—how could they not?—that the First Amendment conditions application of its civil rights laws. This actually *disproves* that Christian Healthcare lacks standing to complain now. First, the Michigan authorities have not conceded that they agree with Christian Healthcare's application of the ministerial exception to its employees, and, as will be discussed below, there is substantial reason to believe that they will not. Second, private individuals may bring actions under those same laws, bringing the likelihood of attempted enforcement against Christian

7

Healthcare close to a certainty. *See* Mich. Comp. Laws § 37.2801. And, third, the fact that others have had to litigate their religious rights when facing a civil rights employment complaint under Michigan's laws demonstrates, not that its free exercise rights will never be challenged, but that the enforcement threat to Christian Healthcare is very real. *See Driehaus*, 573 U.S. at 165-66; *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023) (litigating application of Colorado's civil rights laws in a similar context).

The analysis of the likelihood of an enforcement proceeding against Christian Healthcare also cannot properly ignore the current political context. Christian Healthcare, being true to its religious beliefs, openly restricts its employment on religious grounds, discriminating against non-Christians and sexually active LGBTQ individuals. It also will not perform sex-change procedures, and its personnel refuse to use a patient's preferred pronouns when they differ from the patient's God-given sex. To some, including those at the highest levels in the state, this conduct smacks of bigotry.

The Michigan Civil Rights Commission consists of eight members appointed by the governor, only four of whom may be from the same political party. At the present time, there are four Democratic members, three Independents, and only one Republican. https://www.michigan.gov/mdcr/commission/meet. Democratic Governor Whitmer appointed all three Independents.

8

The Michigan Attorney General represents the Michigan Department of Civil Rights and the Michigan Civil Rights Commission. Mich. Comp. Laws § 37.2602. The attorney general, either solely or in conjunction with the commission and/or department, has the discretion to file suit for alleged violations of the civil rights laws. Presently, the attorney general is Dana Nessell, whose Wikipedia page (https://en.wikipedia.org/wiki/Dana_Nessel) contains the following information:

- Ms. Nessell is the first openly LGBT person elected to statewide office in Michigan;

- She met her wife Alanna Maguire while they were working on the legal case of *DeBoer v. Snyder,* which legalized same-sex marriage;

- In 2016, she founded Fair Michigan, an organization that works to prosecute hate crimes against the LGBT community;

- After Ms. Nessell became attorney general, she withdrew the state from eight amicus briefs joined by her predecessor, including three briefs supporting religious rights and one brief that supported a Missouri employer charged with discrimination in failing to hire a homosexual man; https://www.detroitnews.com/story/news/local/michigan/2019/01/31/nessel-nixes-state-involvement-8-federal-lawsuits/2735691002/;

- Shortly after taking office, Ms. Nessell changed state policy to require the termination of state contracts with those adoption agencies that refuse to

9

work directly with LGBT couples (the previous policy adopted in 2015

allowed religious agencies to refer LGBT couples to other adoption

agencies). A Catholic adoption agency and adoptive parents filed suit, and

then moved for a preliminary injunction. In granting the injunction, U.S.

District Judge Robert Jonker found the following evidence persuasive:

> Based on the record to date, Defendant Nessel is at the very
> heart of the case. She referred to proponents of the 2015 law
> [that protected religious adoption agencies] as "hate-mongers"
> and said the only purpose of the 2015 law was "discriminatory
> animus." She described the 2015 law as "indefensible" during
> her campaign. These statements raise a strong inference of a
> hostility toward a religious viewpoint. Based on the present
> record, she was also a pivotal player in the State's total reversal
> of position in the *Dumont* litigation. It was her assessment of
> risk that led the State to move from defending St. Vincent's
> position to abandoning it in the first month of her term – and
> this despite the 2015 law, the language of the contracts, and
> well-established practice. All of this supports a strong inference
> that St. Vincent was targeted based on its religious belief, and
> that it was Defendant Nessel who targeted it.

*Buck v. Gordon,* 429 F. Supp. 3d 447, 467 (W.D. Mich. 2019).

With an investigative commission with seven of eight members

appointed by a Democratic governor, with an attorney general with values

diametrically opposed to those of Christian Healthcare and with a proven

record of litigation in near-identical circumstances, and with a legislature

that refused to provide any express exemption for religious organizations

when it expanded its civil rights act to include prohibitions against sexual

10

orientation and gender identity discrimination, Christian Healthcare faces a

substantial threat of enforcement because of its religious practices.[2]

The Eighth and Fifth Circuits have recently resolved similar cases properly

and in tension with the court below. In *Religious Sisters of Mercy v. Bacerra*, 55

F.4th 583 (8th Cir. 2022), and *Franciscan Alliance, Inc. v. Bacerra*, 47 F.4th 368

(5th Cir. 2022), the U.S. Department of Justice argued that doctors did not have

standing to seek injunctive relief concerning recently issued federal regulations

because the agency had not yet decided whether the regulations would apply if

doctors, due to their religious beliefs, refused to provide certain services to

transgender youth. Both circuit courts held that, by virtue of the Department of

Justice saying the issue was not yet decided, it conceded a credible threat of

enforcement. *Religious Sisters*, 55 F.4th at 602-06; *Franciscan Alliance*, 47 F.4th at

376. That the agency had enforced the regulation against similarly situated doctors

also showed the harm was sufficiently imminent. *Religious Sisters,* 55 F.4th at 606.

---

[2] Indeed, considering the well-publicized travails of Masterpiece Cakeshop, which the Colorado Civil Rights Commission continues to pursue for violating the sexual orientation and sexual identity prohibitions in its public accommodations laws following its rebuff by the United States Supreme Court in *Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n*, 138 S. Ct. 1719 (2018), the district court's conclusion that Christian Healthcare does not have a substantial risk of the attempted enforcement of the SOGI provisions of the revised Michigan civil rights act seems more than a little naive. *See Scardina v. Masterpiece Cakeshop Ltd.*, 2023 COA 8 (Colo. Ct. App. 2023) (rejecting first amendment defenses of the cakeshop).

Christian Healthcare is an employer targeted by Michigan's addition of the categories of "gender identity" and "sexual orientation" to its civil rights laws. The threat of enforcement against it is real and imminent. It has standing to complain to prevent the threatened harm from occurring.

II.     The Religion Clauses Prohibit Governmental Personnel from Interfering with a Religious Organization's Good-Faith Determination of Which Employees Must Conform to the Organization's Religious <u>Beliefs and Practices for It to Carry Out Its Ministry Purposes</u>

All manner of religious organizations exist in America. Some are traditional churches, synagogues, and mosques with formal worship services and a strict hierarchy. Others operate independently with little formal structure or supervision. Still others operate medical or food service missions, schools, or missionary ministries. *Amici* represent many of these different types of organizations. All of these diverse organizations operate their missions through people. Many religious organizations, including *Amici*, have a good-faith, sincere belief that the best way for them to fulfill their mission is to associate with employees who are faithful, both in belief and conduct, to the organization's doctrines and purposes.

In *Hosanna-Tabor*, the Court found that the Religion Clauses protected a Lutheran school from claims of discrimination when it terminated its school teacher. 565 U.S. at 192. While the Court outlined multiple factors that supported its decision, it fundamentally held that "imposing an unwanted minister" on a

12

religious organization would violate both the Free Exercise Clause, which guarantees to a religious group the "right to shape its own faith and mission," and the Establishment Clause, which "prohibits government involvement in such ecclesiastical decisions." *Id.* at 188-89.

In *Our Lady of Guadalupe*, the Court emphasized that the organization bestowing the title of "minister" on its employee was not critical for application of the ministerial exception. Instead, the Court explained that "[w]hat matters, at bottom, is what an employee does." 140 S. Ct. at 2064. In making this determination, the Court stated that it would defer to the religious institution's judgment:

> [T]he schools' definition and explanation of their roles is important. In a country with the religious diversity of the United States, judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition. A religious institution's explanation of the role of such employees in the life of the religion in question is important.

*Id.* at 2066. This deference precluded second-guessing the organization's judgment that an employee needed to, but did not, adhere to the faith and practice requirements of the religious group, as this "would risk judicial entanglement in religious issues." *Id.* at 2069.

Such deference is consistent with the Court's historic religious freedom jurisprudence's focus on church autonomy. In *Watson v. Jones*, 80 U.S 679 (1871)*, Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94 (1952), and *Serbian Orthodox*

13

*Diocese vs. Milivojevich*, 426 U.S. 696 (1976), the Court consistently and strongly affirmed that religious groups have the right to determine their own rules and mission without oversight by secular authorities. The Court made these determinations in the context of some of the most contentious issues of the day. In *Watson*, the Court deferred to religious authorities in a case originating out of a slavery dispute that spanned the Civil War. Despite the compelling state interest, the Court deferred to religious authorities, noting that the church is the exclusive judge of religious issues within its own jurisdiction and that the decision of a religious authority on such questions is binding on the secular courts. 80 U.S. at 728-36. In *Kedroff*, the Court faced a dispute between American and avowedly pro-communist Soviet churches during the height of the Cold War. The Court ruled in favor of the pro-Soviet church, explaining that the New York legislature's decision to favor the American church improperly "intrude[d] for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." 344 U.S. at 119.

Justice Thomas captured well the Court's historic approach to such church-state issues in his concurrences in *Hosanna-Tabor* and *Our Lady of Guadalupe.* In those opinions, he stated that the "Religion Clauses require civil courts to defer to religious organizations, good-faith claims that a certain employee's position is ministerial." *Our Lady of Guadalupe*, 140 S. Ct. at 2069-70 (Thomas, J.,

concurring); *see also Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring). Justice Thomas, therefore, rightly limited his inquiry to whether the religious groups asserted in good faith that the worker needed to believe and exercise the faith consistently with that espoused by the organization in order for it to carry out its religious mission to the best of its ability.

III.    Christian Healthcare's Religion-Infused Mission, Hiring Practices, and Ways of Working Across the Breadth of Its Workforce Demands <u>Application of the "Ministerial Exception"</u>

Religiously-based hospitals qualify for the ministerial exception. This Court in *Hollins v. Methodist Healthcare, Inc.*, held that a hospital may qualify for application of the ministerial exception so long as "that entity's mission is marked by clear or obvious religious characteristics." 474 F.3d 223, 226 (6th Cir. 2007), *abrogated on other grounds by Hosanna-Tabor*; *see also Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416 (2d Cir. 2018) (applying ministerial exception in a hospital setting). Similarly, in *Conlon v. Intervarsity Christian Fellowship/USA*, 777 F.3d 829 (6th Cir. 2015), this Court found an entity qualified for the ministerial exception because it was a "Christian organization, whose purpose is to advance the understanding and practice of Christianity." *Id.* at 835. That also aptly describes Christian Healthcare.

After the ministerial exception doctrine is found to apply to an institution, the determination of whether the exception applies to a particular employee is

"based on the function of the plaintiff's employment position rather than the fact of ordination." *Id.* This Court further explained in *Hollins* that, as a general rule, the ministerial exception will be invoked if "the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." 474 F.3d at 226.

A review of Christian Healthcare's entire mode of operating demonstrates the pervasive religious nature of its entire operation and the centrality of religious faith and practice for its staff. Christian Healthcare has adopted a logo that explicitly places "Christ centered" in the middle of all the services it provides. Compl., R. 1, Page ID # 7 (¶25). All of Christian Healthcare's employees[3] are required to affirm they agree with, will personally adhere to, and abide by a Statement of Faith, Philosophy of Wellness and Healthcare, Statement of Values, Affirmation on Marriage and Human Sexuality, and Code of Conduct (collectively, the "Religious Statements"). Compl., R. 1, Page ID # 16 (¶94). Employees are required to reaffirm their commitment to these values by signing the Religious

---

[3] The employees include the CEO, Director of Operations, Medical Director, physicians, physician assistants, nurse practitioners, Biblical Counselors, Member Services Coordinator, Member Services/Reception, nurses, the office manager, a custodian, and medical assistants, all of whom are required to agree with, follow, and effectively communicate the Religious Statements. Compl., R. 1, Page ID # 20-25 (¶¶122, 132, 137, 151, 157, 168).

16

Statements each year at the time of the employee's annual review. Compl., R. 1, Page ID # 17 (¶96).

The Code of Conduct requires all employees to acknowledge their belief in Jesus Christ as Lord and Savior and to agree to participate actively in the ministry of a Christian church. Compl., R. 1, Page ID # 18 (¶106). Christian Healthcare also provides training to staff members on the ministry's distinctly Christian approach to healthcare, as well as the ministry's religious beliefs and convictions. *Id.* (¶108). Employees are expected to share their religious faith with other staff, patients, and other non-employees with whom they interact. Compl., R. 1, Page ID # 20-22, 24-25 (¶¶123, 134, 140, 157, 163, 169).

Staff at Christian Healthcare begin each workday with corporate prayer, including personal sharing of prayer requests and prayer for the patients who will visit the clinics that day. Compl., R. 1, Page ID # 13 (¶64). In addition, Christian Healthcare has a longer staff meeting each month during which its staff engages in corporate worship, Bible study, and an extended period of corporate prayer. Staff members also have a quarterly meeting that includes similar worship, Bible study, and prayer. *Id.* (¶¶67-68). Christian Healthcare explains to prospective patients that, in providing its services, it will comport with its Statement of Faith and other religious documents and that its providers will not provide services that conflict with their religious beliefs. Compl., R. 1, Page ID # 13 (¶60). It directs all of its

17

healthcare-provider employees to "spread the faith" as they perform their jobs. *See* Compl., R. 1, Page ID # 20-25 (¶¶123, 134, 140, 157, 163, 169).

These allegations, which must be accepted as true for purposes of this appeal and which are not contested on the current record, amply demonstrate that Christian Healthcare is an organization that has "clear [and] obvious religious characteristics." *Id.* Christian Healthcare is an organization based on, and suffused by, religious principles. It asks and expects each of its employees to explicitly agree to these principles and act on them as they fulfill their roles at the hospital. These realities demand application of the ministerial exception to its employment decisions.

IV. Application of the First Amendment Requires Entry of a Preliminary Injunction Barring Michigan from Enforcing Its Statutes with Respect to Employment Decisions of Christian Healthcare

Michigan's civil rights laws prohibit employers from discriminating on the basis of religion, sexual orientation, or gender identity. Michigan Civil Law § 37.2202(1)(a). The law also prohibits employers from questioning "that elicits or attempts to elicit information" concerning that person's religion or that "expresses a preference, limitation, specification, or discriminated based on religion, . . . sex,  . . . marital status," "sexual orientation," or "gender identity" or that keeps records of that information. *Id.* (2).

18

Christian Healthcare, in fulfilling its religious mission, violates these provisions. To enforce them against it will directly interfere with its ability to hire, to set its terms of employment, to discipline, and to terminate its employees. It will be unable to hire employees based on their religious beliefs or even ask about religious practices prior to making employment decisions. Christian Healthcare will also be unable to maintain its distinctly Christian character or provide Biblical ministry services to its clients. All of these restrictions violate the First Amendment to the U.S. Constitution as outlined by *Watson*, *Kedroff, Milivojevich, Hosanna-Tabor*, and *Our Lady of Guadalupe*. Therefore, this Court should remand with instructions that Christian Healthcare's motion for preliminary injunction should be granted.

*Amici* represent organizations with different beliefs and practices with respect to religious employment, but, like Christian Healthcare, they share in the reality that all of their actions and missions depend upon the people they hire. *Amici*'s decisions about which employees to employ and how to operate their organizations must adhere to the organization's beliefs and practices to allow the organizations to best serve their religious purposes. Such decisions are reserved to the religious organizations by both the Free Exercise and Establishment Clauses. It lies at the core of the church autonomy doctrine.

19

<u>Conclusion</u>

This Court should reverse the district's decision and find that Christian Healthcare has standing to pursue its claims. It should also instruct the district court to grant the motion for preliminary injunction so that Christian Healthcare may pursue its religious mission in the hiring, terms of employment, discipline, and termination of its employees without risk of application of Michigan's recently amended civil rights laws.

Respectfully submitted,

<u>/s/ Frederick W. Claybrook, Jr.</u>
Frederick W. Claybrook, Jr.
  (Counsel of Record)
Claybrook LLC
655 Fifteenth St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
rick@claybrooklaw.com

Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 463-6133
sfitschen@nationallegalfoundation.org

October 23, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to Fed. R. App. P. 32(a)(5)(A) and

32(a)(7)(B)(i) and the corresponding local rules, the attached Brief *Amicus Curiae*

has been produced using 14-point Times New Roman font which is proportionately

spaced and contains 4,546 words, including footnotes and excluding those portions

not required to be counted, as calculated by Microsoft Word 365.

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
        (Counsel of Record)
Claybrook LLC
655 Fifteenth St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
rick@claybrooklaw.com


DATED: October 23, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2023, the foregoing brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit through the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
    (Counsel of Record)
Claybrook LLC
655 Fifteenth St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
rick@claybrooklaw.com