No. 23-1769

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

CHRISTIAN HEALTHCARE CENTERS, INC.,

*Plaintiff-Appellant,*

v.

DANA NESSEL; JOHN E. JOHNSON, JR.; PORTIA L. ROBERSON; ZENNA FARAJ ELHASON; GLORIA E. LARA; REGINA GASCO-BENTLEY; ANUPAMA KOSARAJU; RICHARD CORRIVEAU; DAVID WORTHAMS, in their official capacities as members of the Michigan Civil Rights Commission,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:22-cv-00787

---

## Brief of Amicus Curiae
## Association of Classical Christian Schools
## in Support of Plaintiff-Appellant and for Reversal

Deborah J. Dewart
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554

Randall L. Wenger
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

*Attorneys for Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 23-1769          Case Name: Christian Healthcare Centers v. Nessel

Name of counsel: Randall L. Wenger

Pursuant to 6th Cir. R. 26.1, Association of Classical Christian Schools
                              *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
    identity of the parent corporation or affiliate and the relationship between it and the named
    party:

    No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
    in the outcome?  If yes, list the identity of such corporation and the nature of the financial
    interest:

    No

CERTIFICATE OF SERVICE

I certify that on _____ October 25, 2023 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Randall L. Wenger

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT…………………………….i

TABLE OF AUTHORITIES……………………...……………………….iv

INTEREST OF AMICUS CURIAE………………………………………1

SUMMARY OF THE ARGUMENT………………………...…………….2

ARGUMENT………………………………………………….…………….4

I.   Ministerial Employees are the "Lifeblood" of a Religious Organization Because They are Critical to the Organization's Ability to Pursue its Mission and Disseminate its Message……….……………………….…………....4

  A. The Ministerial Exception Safeguards a *Trilogy* of Core First Amendment Rights – Speech, Association, and Religion……………………………………………...………5

  B. Every Religious Organization is Entitled to Define its *Mission* and Select Representatives to Disseminate its *Message*………………………………………….……6

  C. A Religious Organization Speaks a *Message* Inextricably Linked to its *Mission*. The Organization Must Retain the Exclusive Right to Select the Messenger…………………….....11

  D. A Religious Organization Conveys its Message Not Only Through Speech, But Also the *Conduct* of its Representatives…………………………………………...13

  E. Every Association – Religious or Not – is Entitled to Select Those Who Will Disseminate its Unique Message and Fulfill its Mission……………………………...…………15

II.  Operating a Religious Organization in Accordance with that Organization's Religious Doctrine is Not Invidious, Irrational, or Arbitrary Discrimination……………………….…....17

A. This Case is the Foreseeable Product of the United States Supreme Court's Decisions in *Obergefell* and *Bostock*……......19

B. The Expansion of Anti-Discrimination Principles Has Accelerated the Potential for Collision with First Amendment Rights…………………………………………...…22

C. The Ministerial Exception Complements the Broad Coreligionist Doctrine, Based on Case Precedent and the Title VII Statutory Exemption from Religious Discrimination…………………………………….……24

CONCLUSION…………………………………………………..…26

CERTIFICATE OF COMPLIANCE………………………..………28

CERTIFICATE OF SERVICE……………………………………...29

# TABLE OF AUTHORITIES

**Cases**

*Bates v. City of Little Rock,* 361 U.S. 516 (1960) .....................................6

*Bd. of Ed. of Westside Community Schools (Dist. 66) v. Mergens,*
496 U.S. 226 (1990)..................................................................................11

*Bostock v. Clayton County, Ga.,* 140 S. Ct. 1731 (2020) ............... 3, 20, 21

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000)..................... 7, 10, 22

*Braunfeld v. Brown*, 366 U.S. 599 (1961) ...............................................16

*Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000) ....................... 10, 16

*Capitol Square Review & Advisory Bd. v. Pinette,*
515 U.S. 753 (1995).................................................................................11

*Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327 (1987) .......25

*Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown
Univ.,* 536 A.2d 1 (D.C. 1987).................................................................24

*Healy v. James*, 408 U.S. 169 (1972).......................................................6

*Heffron v. International Soc. for Krishna Consciousness, Inc.,*
452 U.S. 640 (1981)..................................................................................11

*Hobbie v. Unemployment Appeals Comm'n of Florida,*
480 U.S. 136 (1987)..................................................................................18

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
565 U.S. 171 (2012)............................................................................ passim

*Hsu v. Roslyn Union Free Sch. Dist. No. 3,*
85 F.3d 839 (2d Cir. 1996) ........................................................................9

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) .............................................................. 12, 22

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1951) ........................................................................ 22

*Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384 (1993) .............................................................................. 11

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) ........................................................................ 20

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ..................................................... 12

*McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) ...................... 5

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) .......................................................................... 11

*New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1 (1988) .................................................................................. 10

*Obergefell v. Hodges,* 576 U.S. 644 (2015) ..................................... passim

*Our Lady of Guadalupe Sch.* v. *Morrissey-Berru*, 140 S. Ct. 2049 (2020) ............................................................... 9, 12, 14

*Petruska v. Gannon University*, 462 F.3d 294 (3d Cir. 2006) .................. 8

*Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) ........................................................... 8, 25

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) .............................................................................. 11

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ......................................... 7

*Rumsfeld v. Forum for Academic & Inst. Rights*,
    547 U.S. 47 (2006) ................................................................7

*Spencer v. World Vision, Inc.*, 619 F.3d 1109 (9th Cir. 2010) .......... 25, 26

*Thomas v. Review Bd. of Ind. Emp't*, 450 U.S. 707 (1981).....................18

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ......................12

*Washington v. Glucksberg,* 521 U.S. 702 (1997) ......................................5

*Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1872) ....................................14

*West Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)...............................................................21

*Widmar v. Vincent,* 454 U.S. 263 (1981)...............................................11

*Wilson v. Cable News Network, Inc.*, 444 P.3d 706 (Cal. 2019)..............15

*Wooley v. Maynard*, 430 U.S. 705 (1977) ...............................................12

**Statutes**

42 U.S.C. § 2000e-1 ...............................................................................25

**Other Authorities**

David E. Bernstein, *Defending the First Amendment From
    Antidiscrimination*, 82 N.C. L. REV. 223 (2003)...................................23

Harlan Loeb and David Rosenberg, *Fundamental Rights in Conflict:
    The Price of a Maturing Democracy*,
    77 N.D. L. REV. 27 (2001) ...................................................23

Ira C. Lupu, *Free Exercise Exemption and Religious Institutions:
    The Case of Employment Discrimination*,
    67 B.U. L. REV. 391 (1987)...........................................4, 16

Jack S. Vaitayanonta, Note: *In State Legislatures We Trust? The "Compelling Interest" Presumption and Religious Free Exercise Challenges to State Civil Rights Laws*, 101 COLUM. L. REV. 886 (2001)............................................................23

Michael W. McConnell, "*God is Dead and We have Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. REV. 163 (1993) ............................................................24

## INTEREST OF AMICUS CURIAE[1]

Amicus curiae urges the Court to reverse the decision of the district court.

Amicus curiae is the Association of Classical Christian Schools (ACCS). Amicus ACCS represents more than 500 classical Christian schools, typically K-12, although many have preschools. These schools practice classical education based on the seven liberal arts in a Christian setting and from a Christian worldview. Amicus cares deeply about the ministerial exception because the existence of a strong ministerial exception helps to safeguard the religious character and mission of Amicus's member schools and other religious organizations. Amicus and its members are increasingly experiencing the conflict between the prevailing culture and the schools' teachings on human sexuality, marriage, and gender. A strong ministerial exception preserves their ability to hire teaching staff that will teach a full-orbed biblical understanding of the world. A weak ministerial exception jeopardizes the

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or any person other than amicus curiae or their counsel contributed money intended to fund preparation or submission of this brief. This brief is accompanied by a Motion for Leave to File.

unique religious contributions of these and other religious institutions, such as Christian Healthcare Centers, Inc. Amicus's experience will aid this Court's understanding of what is at stake.

## SUMMARY OF THE ARGUMENT

Plaintiff-Appellant Christian Healthcare Centers, Inc. (Christian Healthcare) is a religious, nonprofit healthcare and wellness ministry that serves all people regardless of race, religion, sex, sexual orientation or gender identity. Christian Healthcare was founded to provide a distinctly Christian alternative to traditional primary care by striving to meet its patients' medical, emotional and spiritual needs. Its mission is defined by religious beliefs that are deeply rooted and intertwined with all aspects of Christian Healthcare's ministry. The ministry hires and trains its employees to carry out the various roles necessary for Christian Healthcare to fulfill its religious mission. Spiritual disciplines such as scripture reading and prayer are considered vital components of a person's health and wellness. Therefore, Christian Healthcare can only fulfill its mission if it is able to select employees who believe and adhere to Christian Healthcare's beliefs and values.

Michigan's employment anti-discrimination laws are in direct conflict with Christian Healthcare's rights as a religious entity. By depriving Christian Healthcare of its ability to select and maintain employees who share the ministry's religious beliefs, these laws are fatal to the ministry's ability to fulfill its mission.

This case follows a growing trend of challenges to religious practices using anti-discrimination laws aimed at sexual orientation and gender identity. That trend is unremarkable considering the United States Supreme Court's opinions in *Obergefell v. Hodges,* 576 U.S. 644 (2015), and *Bostock v. Clayton County, Ga.,* 140 S. Ct. 1731 (2020).

Religious faith is not an isolated compartment of life, but a broad worldview that intersects every square inch in the lives of adherents and the organizations they operate. The promise of liberty requires broad religious protections, including the ministerial exception, in order to protect religious believers and their institutions. All Americans benefit when we enable the ordering of our lives around those principles most important to us without fear of backlash.

Unless the Court steps in to provide meaningful First Amendment protection, Michigan will continue to prevent faith-based organizations

from hiring those who share their religious beliefs—even religious beliefs about marriage and sexuality—beliefs that the Supreme Court has declared "decent and honorable." *Obergefell*, 576 U.S. at 672. The end result of laws like those in Michigan is clear—religious organizations will be forced to choose between their religious mission and continuing to operate—but we are all worse off when we shut down religious organizations with their unique contributions and service to our communities.

## ARGUMENT

## I. Ministerial Employees are the "Lifeblood" of a Religious Organization Because They are Critical to the Organization's Ability to Pursue its Mission and Disseminate its Message.

The ministerial exception enables a religious organization to preserve its core identity and perpetuate its existence by freely choosing those who will speak for it and carry out its mission. Associational autonomy is critical to this task. Ira C. Lupu, *Free Exercise Exemption and Religious Institutions: The Case of Employment Discrimination*, 67 B.U. L. REV. 391, 436 (1987). As the Fifth Circuit explained, ministerial employees are the "lifeblood" of a religious organization, the "chief instrument by which the [organization] seeks to fulfill its purpose."

4

*McClure v. Salvation Army*, 460 F.2d 553, 558-59 (5th Cir. 1972). An employee's function and primary duties reveal whether that person is part of the "lifeblood" that flows through an institution's veins as it pursues its mission and disseminates its message. Just as teachers are the quintessential "lifeblood" of a religious school, the employees of Christian Healthcare are the essential, foundational components of its ministry. If Christian Healthcare's ability to live out its faith through every role and in every aspect of its medical and wellness services is barred, the ministry cannot carry out its religious mission.

## A. The Ministerial Exception Safeguards a *Trilogy* of Core First Amendment Rights—Speech, Association, and Religion.

Speech, association, and religion are all "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," so that "neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg,* 521 U.S. 702, 721 (1997). These intertwined rights would be fundamental even if not explicitly stated in the First Amendment.

Without the robust protection long recognized by the United States Supreme Court, Christian Healthcare would have to forfeit all three

rights. These basic liberties "are protected not only against heavy-handed frontal attack, but also from being stifled by *more subtle governmental interference.*" *Healy v. James*, 408 U.S. 169, 183 (1972), quoting *Bates v. City of Little Rock,* 361 U.S. 516, 523 (1960) (emphasis added). Here, Michigan wields anti-discrimination laws as a sword to those religious beliefs that are at odds with its stance on the sensitive topics of gender identity and sexuality. Such topics, from time out of mind, have been understood and encompassed within the context of most religious creeds and doctrines. Yet Michigan, through its public-accommodations and employment laws, now denies ministries their ability to exist and function according to their beliefs. By preventing Christian Healthcare from forming a cohesive association with persons who will faithfully transmit its message, Michigan's laws deprive Christian Healthcare of its First Amendment liberties and longstanding protection for religious hiring.

**B.    Every Religious Association is Entitled to Define its *Mission* and Select Representatives to Disseminate its *Message*.**

The themes of *mission* and *message* emerge before and after *Hosanna-Tabor* in the Supreme Court's expressive association

6

jurisprudence. "The right to freedom of association is a right enjoyed by religious and secular groups alike." *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 189 (2012). Any expressive association may create a voice that will faithfully communicate its message and carry out its mission. Whether religious or secular, "[f]orcing a group to accept certain members may impair [its ability] to express those views, and only those views, that it intends to express." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

An association of individuals can only speak through its authorized representatives. An expressive association is "the creation of a voice, and the selection of members is the definition of that voice." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 643 (1984) (O'Connor, J., concurring). Speech is amplified when many voices combine. Government restrictions on expressive association can have a chilling effect on protected speech. *Rumsfeld v. Forum for Academic & Inst. Rights*, 547 U.S. 47, 68 (2006); *Jaycees,* 468 U.S. at 622. Employees speak for an organization through both conduct and spoken words. If employees are not aligned with the association's message, their words and actions are likely to distort that message and eventually alter the organization's character.

Religious organizations are "the archetype of associations formed for expressive purposes, and their fundamental rights surely include the freedom to choose who is qualified to serve as a voice for their faith." *Hosanna-Tabor*, 565 U.S. at 200-201 (Alito, J., concurring). Religious organizations are "dedicated to the collective expression and propagation of shared religious ideals." *Id*. at 200. The free exercise of religion requires that an organization "must retain the corollary right to select its voice." *Petruska v. Gannon University*, 462 F.3d 294, 306 (3d Cir. 2006). The continued existence and identity of a religious association hinges on the persons "select[ed] to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985). This is true for churches, schools, and other religious associations—including the religious corporation at issue in this case.

Amicus ACCS views the mission of Christian Healthcare similarly to its own, although in a different context. As faith-based entities, both amicus and Christian Healthcare exist and serve their communities according to their religious beliefs. Religious schools exist for the

8

"religious education and formation of students," and accordingly, "the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." *Our Lady of Guadalupe Sch.* v. *Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) ("*OLG*"). This selection process is a critical component of a religious organization's "autonomy with respect to internal management." *Id.* at 2060. A school's ability to select its teachers is imperative to preserving its identity. Teachers shape the content and quality of the school's speech. If they are not committed to the school's religious values, the group's voice will be garbled. *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 857 (2d Cir. 1996).

In the same way, Christian Healthcare exists to provide its healthcare services within the framework of a clearly defined philosophy of wellness and healthcare that is distinctly "Christ-centered." That focus is unambiguously set forth in the organization's religious statements and is woven throughout its job descriptions and other documents. Christian Healthcare's ability to select those individuals who will carry out its day-to-day delivery of these services, by incorporating Christ-centered disciplines such as prayer and the reading of scripture, is critical to its mission.

The freedom to associate presupposes the freedom to *not* associate. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). An organization's ability to speak is severely curtailed if it is denied the right to identify the persons who speak for it. This limited right to "discriminate" enables an expressive association to create its distinctive voice, and that encompasses the corollary right to determine who does *not* represent and speak for it.

Christian Healthcare, like any organization committed to the transmission of a system of values, is engaged in constitutionally protected expression. *Dale*, 530 U.S. at 650. That expression is threatened if the ministry is compelled to accept a staff member whose presence may imperil its ability to promote a particular viewpoint. *Id*. at 648; *New York State Club Assn., Inc. v. City of New York,* 487 U.S. 1, 13 (1988). The presence of a staff member who does not adhere to Christian Healthcare's religious beliefs would encroach on the ministry's ability to represent and advocate its religious values. Without the freedom to hire individuals whose beliefs align with its mission, Christian Healthcare would have no comparable alternative channels to deliver its services according to its faith-based philosophy of wellness and healthcare.

C.    **A Religious Organization Speaks a *Message* Inextricably Linked to its *Mission*. The Organization Must Retain the Exclusive Right to Select the Messenger**.

Communication is critical to any association's ability to fulfill its mission. Religious speech,

> far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression. . . . [G]overnment suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince.

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). *See also Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384 (1993); *Bd. of Ed. of Westside Community Schools (Dist. 66) v. Mergens,* 496 U.S. 226 (1990); *Widmar v. Vincent,* 454 U.S. 263 (1981); *Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640 (1981). Regardless of motives, the state "may not substitute its judgment as to how best to speak" for that of an organization. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 791 (1988); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (crisis pregnancy centers protected against compelled speech regarding state-financed abortions). Compelling an organization to retain an unwanted ministerial employee (or pay a hefty fine) is tantamount to compelled

speech. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 717 (1977); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995). Even a secular business may create a unique brand to convey a message to the public—and do so free of government compulsion. *See, e.g., Matal v. Tam*, 137 S. Ct. 1744, 1760 (2017) (trademark); *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (mushroom producer).

The free speech principles at stake here were evident in *Hosanna-Tabor*. The plaintiff teacher had a role in "conveying the Church's message and carrying out its mission." 565 U.S. at 192; *id.* at 204 (Alito, J., concurring). In *OLG*, similarly, the teachers were "entrusted most directly with the responsibility of educating their students in the faith." 140 S. Ct. at 1066. The ministerial exception "should be tailored to this purpose" and applied to any employee who "serves as a messenger or teacher of its faith." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). Considering the critical role of those who speak for a religious association, "[t]he Constitution leaves it to the collective conscience of each religious group to determine for itself who is qualified to serve as a teacher or messenger of its faith." *Id.* at 202.

For Christian Healthcare, each staff member has a role in the messaging and delivery of services that reflect and integrate Christian Healthcare's faith-based philosophy of wellness and healthcare. This focus is emphasized and defined in Christian Healthcare's Statement of Faith and Statement of Values, both of which must be signed by all its staff members. Specifically, in its Statement of Values, Christian Healthcare states under its "Christ-centered" value that "all personnel offer their work up to God as an act of worship, and will treat his or her medical skills as ministering gifts provided by the Great Physician. . . ." Clearly, an individual whose beliefs do not align with this statement or other, similar statements defining Christian Healthcare's core values, cannot effectively communicate these values.

**D.    A Religious Association Conveys its Message Not Only Through Speech, But Also the *Conduct* of its Representatives**.

Religion is a comprehensive worldview, not a compartment detached from daily life. Just as religious school representatives would both speak *about* religion and model its values in their interactions with students, faculty, and others, Christian Healthcare must consider the patients it serves and respond to their expectations and needs. In

13

essence, the employees of Christian Healthcare are its ambassadors. That responsibility includes modeling a lifestyle and conduct that is consistent with the ministry's message. In *OLG*, as in *Hosanna-Tabor*, the United States Supreme Court recognized that "educating young people in their faith, inculcating its teachings, and *training them to live their faith* . . . lie at the *very core* of the mission of a private religious school." 140 S. Ct. at 2064 (emphasis added). Indeed, this is "what an employee does." *Id*. Recognizing that its employees' conduct directly impacts the effectiveness of its message, Christian Healthcare maintains a "Code of Conduct" that each staff member is required to sign. By signing the Code of Conduct, the employee affirms, and agrees to act in accordance with, the religious beliefs and values of Christian Healthcare.

A religious organization may require conformity to its moral standards as a condition of membership. *Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1872). Criteria for those who will serve as representatives of the organization and its message is even more critical and may not be dictated by government.

> When it comes to the expression and inculcation of religious doctrine, there can be no doubt that the messenger matters. . . . [B]oth the content and credibility of a religion's message depend vitally on the

> character and conduct of its teachers. A religion cannot
> depend on someone to be an effective advocate for its
> religious vision if that person's conduct fails to live up to
> the religious precepts that he or she espouses.

*Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring).

### E.    Every Association—Religious or Not—is Entitled to Select Those Who Will Disseminate its Unique Message and Fulfill its Mission.

A broad view of the Supreme Court's expressive association jurisprudence is critical to this case. "The right to freedom of association is a right enjoyed by religious and secular groups alike." *Hosanna-Tabor*, 565 U.S. at 189. Every expressive association is entitled to craft a voice that will faithfully communicate its message and carry out its mission.

"[A]n entity can act and speak only through the individuals that comprise and represent it." *Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 720 (Cal. 2019). Speech is often most effective when many voices are combined. Employees speak for an organization through their conduct and spoken words. If they are not committed to the association's purposes, they are likely to misrepresent the group. Over time, the association's fundamental identity may be distorted beyond recognition.

Michigan's employment nondiscrimination laws not only impact Christian Healthcare and other religious organizations, they also stifle

the freedom of non-religious groups to associate and disseminate a clear message through their chosen representatives. There is no substitute for a group's right to select its members and leaders. *Cal. Democratic Party*, 530 U.S. at 581. Regulating the identity of a political party's leaders interferes with the content and promotion of its message. *Id*. at 579. Similarly, associational autonomy is critical to a religious organization's preserving its identity. Lupu, *Free Exercise Exemption*, 67 B.U. L. Rev. 391. A religious institution may not be forced to say "anything in conflict with [its] religious tenets." *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961). Government regulation has the potential to "alter both content and the mode of expression of its shared commitments over time." Lupu, *Free Exercise Exemption*, 67 B.U. L. Rev. at 434.

The freedom to associate presupposes the freedom to *not* associate. *Cal. Democratic Party,* 530 U.S. at 574. Without the ability to select those messengers who will represent it and speak on its behalf, an organization loses control of its message. Equally important is the ability of an organization to decline to select or retain those individuals it determines should not entrusted to speak on behalf of the organization. It is this limited right to "discriminate" in its expressive association that enables

16

an organization to ensure that its unique message remains consistent with its mission. This case exemplifies that right. Christian Healthcare must retain the right to decline to hire or retain an individual who disagrees with its religious message. That is the only way it can preserve and carry out its unique mission.

## II.    Operating a Religious Organization in Accordance with that Organization's Religious Doctrine is Not Invidious, Irrational, or Arbitrary Discrimination.

Michigan's use of its employment nondiscrimination laws to punish religious entities for hiring those who share their religious beliefs is a complete denial of these organizations' right to operate in accordance with their religious doctrine. Moreover, these laws force ministries such as Christian Healthcare to speak views, restrict their speech and take actions that directly violate their faith. By placing a *statutory* right on equal footing with a *constitutional* right, Michigan now wields its authority against religious organizations that act consistently with beliefs about important issues on which members of a free society may reasonably disagree.

The action of a *religious* organization, motivated by its *religious* doctrine, is not arbitrary, irrational, unreasonable, or invidious. Indeed,

a religious organization's selection of employees who support its religious mission is not "discrimination" at all. *See Obergefell*, 576 U.S. at 679-80 ("The First Amendment ensures that religious organizations . . . are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered."). This is not a case where the law may proscribe refusal to conduct business with an entire group based on personal animosity or *irrelevant* criteria. It is *relevant* for a religious organization to consider an employee's agreement (or disagreement) with its religious doctrine and mission. A court's refusal to consider religious motivation and relevance—and distinguish that from invidious discrimination—"tends to exhibit hostility, not neutrality, towards religion." *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 142 (1987); *see also Thomas v. Review Bd. of Ind. Emp't*, 450 U.S. 707, 708 (1981).

Religious employers' pursuit of employees that share their mission is not invidious but indispensable to maintaining the character of an organization. A religious employer should be free to hire those who both believe what the organization believes and who seek to live consistently

18

with those beliefs. Human sexuality is inseparable from most religious doctrinal belief systems and expectations as to conduct within those belief systems. While any employee will have certain sexual desires, most religious employers expect their employees to agree with their belief system on these issues and act according to their belief systems. For instance, most religious organizations will teach that consensual sex with a non-spouse is immoral even though they know employees may have sexual desire for people who are not their spouse. The religious organization knows people have desires to do things they teach are wrong, but they seek to hire people who both believe what the organization does about those desires and seek to live consistently with those beliefs. Recognition of a broad ministerial exception is essential to religious freedom, freedom of speech, and association. Without it, religious groups cannot adhere to teachings that are core to their understanding of their religion.

### A.    This Case is the Foreseeable Product of the United States Supreme Court's Decisions in *Obergefell* and *Bostock*.

There is an alarming surge in the use of anti-discrimination laws to compel uniformity of thought and action about sexual mores, contrary to *Obergefell*'s admonition that religious organizations and persons

should be free to organize their lives around these issues. This is hardly a shocking development. Indeed, it is the foreseeable result of the Court's rulings in *Obergefell*, 576 U.S. 644, and *Bostock*, 140 S. Ct. 1731. The Court put its thumb on the scale on issues of profound cultural and religious significance but failed to immediately relieve the burdens it had inadvertently created. *Obergefell*, 576 U.S. at 711 (Roberts, C.J., dissenting) ("Federal courts . . . do not have the flexibility of legislatures to address concerns of parties not before the court. . . ."). Justice Thomas warned of "potentially ruinous consequences for religious liberty." *Id*. at 734 (Thomas, J., dissenting). Unfortunately, the Court's promises to preserve religious liberty, *id*. at 679-680, ring hollow in this case. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018), provided narrow protection against open government hostility to religion. But much broader protection is needed to guard the liberty of religious organizations, which is in imminent jeopardy. Michigan's employment anti-discrimination laws are openly hostile toward religious organizations and ministries such as Christian Healthcare. Without the benefit of its free-speech and religious-liberty rights, this ministry and

others like it have no means to preserve their religious identity and pursue their mission while remaining faithful to their core beliefs.

Misinterpretations of *Obergefell* and *Bostock* have resulted in brazen efforts to coerce uniformity of thought about the nature of marriage and sexuality, redefining basic biology and concepts that have stood for millennia. Attempts to compel uniform thought are dangerous to a free society where the government must respect a wide range of diverse viewpoints. In the past, "[s]truggles to coerce uniformity . . . have been waged by many good as well as by evil men." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 640 (1943). These efforts are ultimately futile. "Compulsory unification of opinion achieves only the unanimity of the graveyard." *Id.* at 641. Religious organizations and individuals are especially threatened by laws and policies that prohibit "discrimination" based on sexual orientation and/or gender identity. Strong convictions about marriage and sexuality often characterize a system of religious doctrine. Christian Healthcare holds religious beliefs about marriage and sexuality that are intertwined with the religious worldview that undergirds its mission, message, and choice of messengers. The Constitution guarantees Christian Healthcare and

21

other religious organizations "independence from secular control or manipulation" in matters of "faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1951). Michigan's laws crush that independence, and their assault on religious freedom will inevitably create additional collateral damage unless this Court intervenes to restore religious liberty.

**B.    The Expansion of Anti-Discrimination Principles Has Accelerated the Potential for Collision with First Amendment Rights.**

Anti-discrimination policies have roots in the distant past. "State public accommodations laws were originally enacted to prevent discrimination in traditional places of public accommodation—like inns and trains." *Dale*, 530 U.S. at 656. The Massachusetts law at issue in *Hurley* grew out of the common law principle that innkeepers and others in public service could not refuse service to a customer without good reason. *Hurley*, 515 U.S. at 571.

Modern anti-discrimination principles expanded over the years. The traditional "places" have moved beyond inns and trains to commercial entities and even membership associations, increasing the potential collision with First Amendment rights. *Dale*, 530 U.S. at 656.

22

Anti-discrimination rights, whether created by statute or derived from equal protection principles, may conflict with core rights to religious liberty. Harlan Loeb and David Rosenberg, *Fundamental Rights in Conflict: The Price of a Maturing Democracy*, 77 N.D. L. REV. 27, 29 (2001). Commentators have observed the complex legal questions that arise where statutory protections clash with the free exercise of religion. Jack S. Vaitayanonta, Note: *In State Legislatures We Trust? The "Compelling Interest" Presumption and Religious Free Exercise Challenges to State Civil Rights Laws*, 101 COLUM. L. REV. 886, 887 (2001); *see also* David E. Bernstein, *Defending the First Amendment From Antidiscrimination*, 82 N.C. L. REV. 223 (2003) (urging resolution in favor of First Amendment liberties).

The clash between anti-discrimination principles and the First Amendment is particularly volatile when a morally controversial practice is at issue and religious persons or groups are swept within the ambit of the new law. Government ought not legislate a particular view of sexual morality and compel religious institutions and individuals to facilitate it. When the D.C. Circuit addressed the question "of imposing official orthodoxy on controversial issues of religious, moral, ethical and

23

philosophical importance, upon an entity whose role is to inquire into such matters" it concluded that "[t]he First Amendment not only ensures that questions on difficult social topics will be asked, it also *forbids government from dictating the answers." Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.,* 536 A.2d 1, 24 (D.C. 1987) (emphasis added). Religious voices have shaped views of sexual morality for centuries. These deeply personal convictions shape the way people of faith live their daily lives, privately and in public. Advocates of social change with respect to sexuality tend to be "anything but indifferent toward the teachings of traditional religion—and since they are not indifferent they are not tolerant." Michael W. McConnell, "*God is Dead and We have Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163, 187 (1993). Political power can be used to squeeze religious views out of public debate about controversial social issues, as cases like this one demonstrate.

### C. The Ministerial Exception Complements the Broad Coreligionist Doctrine, Based on Case Precedent and the Title VII Statutory Exemption from Religious Discrimination.

There is unquestionably tension between "our cardinal Constitutional principles of freedom of religion . . . and our national

attempt to eradicate all forms of discrimination." *Rayburn*, 772 F.2d at 1167. But a religious organization must be free to exclude non-adherents from employment positions where they could distort the organization's message or hinder its mission. Otherwise, an association could be hijacked by non-adherents who would supplant its identity and message.

Recognizing the unique constitutional protection for religion, the Civil Rights Act of 1964 (Title VII) accommodates religious employers by exempting them from the prohibition against *religious* discrimination. 42 U.S.C. § 2000e-1. The United States Supreme Court upheld the exemption against Establishment and Equal Protection Clause challenges, observing that government should not interfere with "the ability of religious organizations to define and carry out their religious missions." *Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327, 335-336 (1987) (building engineer discharged by nonprofit gymnasium associated with church). This broad exemption allows a religious employer to terminate an employee "for exclusively religious reasons," even "*without respect to the nature of their duties.*" *Spencer v. World Vision, Inc.*, 619 F.3d 1109, 1111 (9th Cir. 2010) (emphasis added). In *Spencer*, the Ninth Circuit upheld World Vision's termination of three

25

employees who performed maintenance, office, and shipping services. All of them initially signed the required "Statement of Faith, Core Values, and Mission Statement" but later were terminated when they renounced the religious doctrine that defines World Vision's mission. *Id.* at 1112.

The constitutionally compelled ministerial exception, based on an *employee's* ministerial status, complements the broad protection grounded in an *employer's* religious nature. Both guard free exercise rights. If otherwise applicable anti-discrimination laws were applied to religious entities without some adjustment for their religious character and purposes, there would be an enormous collision with religious liberty, free speech, and association. Religious entities have broad liberty to "discriminate" based on religious doctrine. Although other anti-discrimination provisions may sometimes apply, the ministerial exception ensures that government does not encroach on a religious organization's liberty to select those employees who are most critical to fulfilling its *religious* mission.

## CONCLUSION

Because of the important First Amendment considerations underpinning the ministerial exception and coreligionist doctrine,

amicus respectfully requests that this court reverse the District Court and grant Christian Healthcare's motion for preliminary injunction.

Respectfully submitted,

<u>/s/ Randall L. Wenger</u>
Randall L. Wenger
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

Deborah J. Dewart
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5). This brief contains 5,112 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in fourteen (14) point Century Schoolbook font.

/s/ Randall L. Wenger
Randall L. Wenger
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

*Attorney for Amicus Curiae*

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of October, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Randall L. Wenger
Randall L. Wenger
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

*Attorney for Amicus Curiae*