

February 22, 2024

**VIA CM/ECF**

Kelly L. Stephens, Clerk
U.S. Court of Appeals for the Sixth Circuit
540 Potter Stewart U.S. Courthouse
100 E. Fifth Street
Cincinnati, OH 45202

Re: *Christian Healthcare Centers, Inc. v. Nessel*, Case No. 23-1769

Dear Ms. Stephens:

I write to advise the Court of supplemental authority under Federal Rule of Appellate Procedure 28(j). A complaint filed in Colorado state court captioned *Kent v. Children's Hospital Colorado*, 2024-cv-30455 (Colo. Dist. Ct. Feb. 14, 2024) (Exhibit A), bolsters Christian Healthcare Centers, Inc.'s argument that its policy of declining to prescribe cross-sex hormones arguably violates Michigan's laws. By extension, the *Kent* complaint also shows that Christian Healthcare faces a credible threat of enforcement.

In *Kent*, a plaintiff sued a hospital under Colorado's Anti-Discrimination Act (CADA). Ex. A ¶¶ 84–90. The plaintiff alleged the hospital engaged in gender-identity discrimination by adopting a policy of declining to perform surgeries that altered sex characteristics for patients experiencing gender dysphoria. *Id.* The plaintiff alleged the hospital discriminated because it offered "the same or substantially" surgeries to treat physical abnormalities unrelated to gender identity. *Id.* This distinction allegedly violated CADA's requirement that public accommodations provide "full and equal" access to their services. *Id.* at ¶ 84 (quoting C.R.S. § 24–34–601(2)(a)).

Michigan interprets the Accommodation Clause's "full and equal enjoyment" language similarly. Michigan arguably requires Christian Healthcare to prescribe cross-sex hormones because it will prescribe testosterone and estrogen to treat men and women for other reasons. Opening Br. 28–29, ECF No. 18. Michigan never disputes or disavows this logic, but argues only that the ministry *may* receive an exemption. That fails as a matter of law. *Id.* at 44–48. In fact, Michigan received a gender-identity discrimination complaint against a religious health clinic under a theory similar to the *Kent* plaintiff's. *Id.* at 16.

1

The *Kent* plaintiff's interpretation of a law like Michigan's supports the ministry's argument that Michigan's laws arguably proscribe its cross-sex hormone practice and policy. *Id.* at 28–29. And, like Michigan's law, CADA allows for private enforcement expanding the universe of potential claimants. *Compare* C.R.S. § 24–34–601(2)(a) (allowing suit in state court) *with* MCL 37.2801 (same). That also supports the ministry's credible threat. Opening Br. 40–41.

Thank you for bringing this letter to the Court's attention.

        Sincerely,

        *s/ Jonathan A. Scruggs*
        Jonathan A. Scruggs
        ALLIANCE DEFENDING FREEDOM
        15100 N. 90th Street
        Scottsdale, AZ 85260
        (480) 444-0020
        jscruggs@adflegal.org

        *Attorney for Appellant*

**CERTIFICATE OF SERVICE**

I certify that on February 22, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

    <u>*s/ Jonathan A. Scruggs*</u>
    Jonathan A. Scruggs
    *Attorney for Appellant*

# EXHIBIT A

| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 BANNOCK ST., ROOM 230<br>DENVER, CO 80202 | DATE FILED: February 14, 2024 9:50 AM<br>FILING ID: E231843E8BB8D<br>CASE NUMBER: 2024CV30455 |
|---|---|
| CADEN KENT,<br><br>    Plaintiff,[1]<br><br>v.<br><br>CHILDREN'S HOSPITAL COLORADO,<br><br>    Defendant. | ▲COURT USE ONLY▲ |
| *Attorneys for Plaintiff*:<br><br>Mary (Mindy) V. Sooter (No. 35136)<br>Arielle K. Herzberg (No. 54234)<br>Phillip R. Takhar (No. 54253)<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>1225 Seventeenth Street, Suite 2600<br>Denver, Colorado 80202<br>P: (720) 274-3135 \| F: (720) 274-3133<br>mindy.sooter@wilmerhale.com<br>arielle.herzberg@wilmerhale.com<br>phillip.takhar@wilmerhale.com<br>*In cooperation with the ACLU Foundation of Colorado*<br><br>Timothy R. Macdonald, # 29180 \| Sara R. Neel, # 36904<br>Emma Mclean-Riggs, # 51307 \| Anna I. Kurtz, # 51525<br>ACLU Foundation of Colorado<br>303 E. 17th Ave., Suite 350<br>Denver, Colorado 80203<br>tmacdonald@aclu-co.org \| sneel@aclu-co.org<br>emcleanriggs@aclu-co.org \| akurtz@aclu-co.org<br>P: (720) 402-3114 \| F: (303) 777-1773 | Case Number:<br><br>Div:<br><br>Ctrm: |
| **COMPLAINT AND JURY DEMAND** | |

---

[1] Caden Kent is a pseudonym. Concurrent with the filing of this Complaint, Plaintiff has moved pursuant to Colo. R. Civ. P. 10(a) to file this matter pseudonymously.

Plaintiff Caden Kent, through counsel, states as follows in support of his complaint against Defendant Children's Hospital Colorado (sometimes "the Hospital" or "CHCO").

## INTRODUCTION

1. On or about July 13, 2023, Children's Hospital Colorado, without warning, notice, or plans for ensuring continuity of care, stopped providing medically necessary surgeries for the treatment of gender dysphoria, a diagnosis unique to transgender patients. Although CHCO had been a trusted provider of such medically necessary surgeries to transgender people over the age of 18, it adopted its change of policy effective immediately, with no prior notice to the public or to its patients whose procedures were scheduled or awaiting scheduling.

2. CHCO now categorically refuses to provide these procedures to transgender patients when medically necessary to treat their gender dysphoria, but continues to offer the same procedures to patients for other medical or non-medical purposes. CHCO's policy unlawfully discriminates on the basis of sex, gender identity, gender expression, and disability in violation of the Colorado Anti-Discrimination Act.

3. Plaintiff Caden Kent was among CHCO's patients denied care under the Hospital's new categorical exclusion. He brings this case to hold CHCO accountable for its refusal to provide medically necessary care to transgender patients.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this case pursuant to C.R.S. §§ 24-34-602 & 24-34-802, and C.R.C.P. 57. No administrative exhaustion requirements bar this court's jurisdiction.

5. Venue is proper in this Court under C.R.C.P. 98(b) and (c).

## PARTIES

6. Plaintiff Caden Kent is 18 years old and lives in Denver, Colorado. Caden is transgender and began receiving care at CHCO's TRUE Center for Gender Diversity in 2021 when he was 16. He was diagnosed with gender dysphoria in early 2022. In 2023, CHCO doctors determined that chest masculinization surgery was medically necessary for Caden and that he was a good candidate for the procedure. Caden had secured the last authorization he needed to be scheduled for surgery at CHCO when it abruptly reversed its existing policy and, as a result, terminated his care plan.

7. Defendant Children's Hospital Colorado is a private, nonprofit pediatric healthcare network. CHCO is a public accommodation as defined under C.R.S. § 24-34-601 and a person as defined under C.R.S. § 24-34-301.

# FACTUAL ALLEGATIONS

*CHCO Provides Young Adult Care*

8. CHCO is the No. 1-ranked pediatric healthcare provider in the state and region. Its stated mission is to improve the health of children through the provision of high-quality coordinated programs of patient care, education, research and advocacy.

9. While the services provided at CHCO are generally focused on the care of children and adolescents under the age of 18, CHCO also provides care to non-pediatric patients, i.e., those 18 and older.

10. CHCO sometimes provides care to non-pediatric patients where CHCO's pediatric expertise carries over to the needs of the patient even though they have legally become an adult; where a clear quality and safety advantage to pediatric expertise exists; or where the patient received care at CHCO before they turned 18.

11. CHCO states that it "encourages transition to adult care no later than a patient's 22nd birthday," but even then, it may recommend continuing care with CHCO as an adult.

12. CHCO recognizes that best practice for the transition from pediatric to adult healthcare should include the patient, the patient's family, and the healthcare team. CHCO recognizes that best practice should include an organized transition process where the patient can prepare for an adult model of care. CHCO recognizes that best practice is to help create an individualized, uninterrupted continuum of care.

*Gender Identity and Gender Dysphoria*

13. The term transgender is used to describe individuals like Caden whose gender identity, or internal sense of gender, differs from the sex they were assigned at birth. The term cisgender is used to describe individuals whose gender identity aligns with their sex assigned at birth. There is growing scientific evidence that gender identity has biological origins.

14. Caden was assigned female at birth, but he has a male gender identity.

15. Gender dysphoria is a medical condition unique to transgender people. It is characterized by the clinically significant distress associated with incongruence between a person's gender identity and assigned sex at birth. Gender dysphoria is recognized by the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition (DSM-V) as its own diagnostic class. It is distinct from the outdated diagnosis of gender identity disorder, which pathologized transgender identity and has been rejected by the medical profession for more than a decade.

16. Being transgender is not a medical condition or disorder. Gender dysphoria, however, is a serious medical condition that, if left untreated, can cause serious psychiatric symptoms, including debilitating anxiety and depression, self-mutilation, suicide attempts, and death by suicide. Gender dysphoria can substantially limit a person's major life activities.

17. The isolation and stigmatization experienced by someone with gender dysphoria often leads to negative self-esteem, increased risk of mental disorders, and comorbidity, i.e., suffering from another disease or disorder.

18. Caden experiences gender dysphoria that is exacerbated by being unable to live consistently with his gender identity.

19. Before he was able to receive appropriate treatment, Caden's gender dysphoria made him retreat from major aspects of his daily life. Basic self-care, like using the restroom and showering, caused him severe distress. He avoided socializing with other people and speaking, so as not to be misgendered because of his voice. He worried constantly about others misperceiving his gender. His gender dysphoria made it difficult for him to sleep at night and to be present in his relationships with others during the day. Caden's gender dysphoria prevented him from living a full life.

*Caden Seeks Care for Gender Dysphoria at CHCO*

20. CHCO houses the TRUE Center for Gender Diversity (TRUE Center), the only comprehensive care center in the Rocky Mountain region specifically set up for transgender children, adolescents, and young adults, like Caden.

21. CHCO and the TRUE Center treat gender dysphoria consistent with the World Professional Association for Transgender Health's (WPATH) internationally accepted Standards of Care. The WPATH Standards of Care are the recognized guidelines for the clinical treatment of transgender people with gender dysphoria based on the best available scientific evidence and professional consensus.

22. Consistent with the WPATH Standards of Care, CHCO and the TRUE Center treat gender dysphoria in people under 18 in a multidisciplinary setting that provides, where medically indicated, diagnosis, counseling, and hormone therapy, among other services.

23. Caden began seeking care at CHCO related to his gender dysphoria in May 2021. He established care with CHCO's Pediatric Mental Health Institute in November 2021, when he was 16 years old.

24. A CHCO doctor diagnosed Caden with gender dysphoria in early 2022 and referred him to the TRUE Center for his primary care.

25. With the support of Caden's parents and clinical psychologist at CHCO and based on an individualized assessment of Caden consistent with the WPATH Standards of Care, a TRUE Center physician prescribed him hormone therapy, which he began in March 2022.

*Treatment of Gender Dysphoria*

26. While not all transgender people with gender dysphoria require surgical care, surgery can be medically necessary to alleviate gender dysphoria in some patients.

27. When medically indicated, surgery is a safe, effective, and evidence-based treatment for gender dysphoria.

28. When medically indicated, surgery significantly reduces gender dysphoria and its serious symptoms, including psychological distress and suicidal ideation.

29. Surgery to treat gender dysphoria can be life-saving medical care.

30. Prior to July 13, 2023, CHCO would sometimes perform such surgical procedures for non-pediatric transgender patients when medically necessary to treat their gender dysphoria. CHCO would provide these procedures to transgender patients over the age of 18 if they began their course of treatment and surgery planning with CHCO before turning 18.

31. CHCO had been one of only three institutions in Colorado that provided medically necessary surgeries to treat gender dysphoria and accepted insurance for the procedures.

32. Many medically necessary surgeries that transgender people receive to treat their gender dysphoria are procedures used to treat other medical conditions or for non-medical purposes.

33. The procedures CHCO offered to treat gender dysphoria included chest masculinization surgery and hysterectomy. CHCO surgeons in the pediatric plastic surgery practice provided chest masculinizing surgery; surgeons in its section of pediatric and adolescent gynecology provided hysterectomies. Both are standard procedures that are also used to treat conditions other than gender dysphoria, including at CHCO.

34. Though there are different approaches to chest masculinization surgery, it typically consists of subcutaneous mastectomy followed by reconstruction of the chest. Other masculinizing top surgery interventions involve breast tissue reduction.

35. Hysterectomy is a surgical procedure to remove the uterus and cervix, and sometimes includes oophorectomy, removal of the ovaries, and/or salpingectomy, removal of the fallopian tubes.

36. Subcutaneous mastectomies with chest/breast reconstruction and hysterectomies are routinely performed to treat cisgender people with cancer or with a genetic propensity for cancer.

37. Subcutaneous mastectomy with chest reconstruction is routinely performed on cisgender men to treat gynecomastia. Gynecomastia is an enlargement of the breast tissue in men or boys, sometimes caused by hormonal imbalances or medications. When it is surgically treated, the breast tissue is removed and a masculine-appearing chest is constructed, as in chest reconstruction in transgender patients for the treatment of gender dysphoria. Gynecomastia can cause severe psychological distress and impact a person's daily life, including social activities and

participation in education and the workplace. Treatment of gynecomastia, including surgical treatment, can help ameliorate its negative psychological effects.

38. Breast reduction surgery is routinely performed on cisgender women and teenagers to treat macromastia, the over-enlargement of female breast tissue. Macromastia can also cause severe psychological distress and impact a person's daily life, including social activities and participation in education and workplace. Treatment of macromastia, including surgical treatment, can help ameliorate its negative psychological effects.

39. Hysterectomy is also performed to treat congenital uterine anomalies, malformations of the uterus typically not discovered until after puberty.

40. The surgical procedures CHCO was providing to transgender patients to treat gender dysphoria were safe, effective, and consistent with the WPATH Standards of Care.

41. The CHCO surgeons who were performing these surgeries were highly trained and skilled.

*Caden is Approved for Medically Necessary Surgery at CHCO*

42. Although hormone therapy improved Caden's symptoms, it did not fully alleviate his gender dysphoria. He continued to experience significant distress that was exacerbated by the misalignment of his secondary sex characteristics with his gender identity. He began binding his chest—a method of flattening the chest with clothing to have a more masculine appearance. He felt uncomfortable leaving his house without a binder. Long periods of binding the chest can cause extreme physical pain, especially during athletic activity. Caden endured this physical pain, as he has a very active lifestyle, with his hobbies and job centered on movement. When the pain became too much, Caden would call out of work and skip his usual hobbies rather than leave home without binding his chest. When he could not bind his chest or wear clothes that could mask his chest, Caden couldn't think about anything else and withdrew from his social relationships.

43. In December 2022, before he turned 18, Caden began discussing chest masculinization surgery with his care team at CHCO.

44. Chest masculinization surgery is highly effective in reducing gender dysphoria, specifically in young transgender men.

45. The CHCO care team told Caden and his family that CHCO would perform chest masculinization surgery on patients over the age of 18 if they had begun their course of treatment and surgery planning with CHCO before turning 18.

46. The CHCO care team gave Caden and his family a list of surgeons recommended by the TRUE Center, which included CHCO surgeons.

6

47. Caden and his family opted to consult with one of the listed CHCO surgeons, a plastic surgeon in CHCO's pediatric plastic surgery practice.

48. Caden and his family chose this surgeon based not only on their qualifications, but because they understood that working with a surgeon within the CHCO system would provide better continuity of care for Caden and because they wanted to work with a pediatric expert who would have experience in counseling, treatment, and post-operative care of a young transgender person.

49. After further consultation with his care team, Caden had a consultation with the surgeon's physician's assistant. The physician's assistant discussed in detail with Caden and his family the WPATH Guidelines for chest masculinization surgery, the risks of the surgery, and the anticipated postoperative recovery. Both Caden and his family indicated they understood and wished to proceed.

50. The physician's assistant explained that Caden would need to obtain and submit letters of support from an endocrinologist and a mental health professional as well as insurance preauthorization, and then would be scheduled for a pre-operative consultation with the surgeon.

51. On May 19, 2023, Caden's CHCO primary care doctor submitted a letter of support stating that he met all the medical criteria and was a good candidate for chest masculinization surgery.

52. On June 2, 2023, Caden's CHCO pediatric mental health care provider submitted a letter stating that chest masculinization surgery was medically necessary treatment for Caden's gender dysphoria.

53. Caden is and was a good candidate for chest masculinization surgery under the WPATH Standards of Care. Chest masculinization surgery is medically necessary treatment for Caden's gender dysphoria.

54. The CHCO surgical physician's assistant confirmed on June 2, 2023 that CHCO had received the required letters and had submitted the request for insurance pre-authorization.

55. On July 13, 2023, Caden's family received an insurance authorization letter in the mail. On July 14, 2023, Caden's father messaged the physician's assistant through the CHCO patient portal to report that they had received the authorization and were ready to be scheduled for surgery.

*CHCO Adopts Exclusionary Policy and Denies Caden Care*

56. On or about July 13, 2023, CHCO determined that it would no longer provide medically necessary surgeries to transgender patients for the treatment of gender dysphoria, effective immediately.

57. Upon information and belief, CHCO cancelled all CHCO transgender patients' scheduled and anticipated surgeries to treat their gender dysphoria. These included surgeries that were in midst of the consultation process and surgeries scheduled as soon as the next day.

58. The Hospital did not provide any further information about its decision or reasoning to medical providers or its staff. CHCO provided no notice to community groups who support transgender people and their families.

59. Upon information and belief, CHCO's abrupt policy reversal and cancellations of care were inconsistent with its own standards governing the transition and transfer of care of its patients.

60. Upon information and belief, CHCO has never previously made an executive decision to stop offering a category of care to only a certain patient population and turned away patients already in the pipeline to receive that care.

61. Upon information and belief, CHCO surgeons who were performing these surgeries remain on CHCO staff and would continue to perform them for transgender patients but for CHCO policy.

62. The surgical procedures CHCO was providing to transgender patients to treat gender dysphoria are still provided by CHCO to treat other diagnoses and needs. CHCO has a plastic surgery program, which provides chest reconstruction to correct pain, discomfort, limitations in daily activities, and differences in appearance, caused by multiple conditions, including gynecomastia. CHCO also has a surgical oncology program, which offers hysterectomies to treat tumors.

63. Under its new policy, CHCO categorically does not provide medically necessary surgeries to transgender patients to treat gender dysphoria. But it still offers the same procedures to patients, including non-pediatric patients, to treat conditions other than gender dysphoria.

64. The day after CHCO's decision, the CHCO physician's assistant (PA) received Caden's insurance preauthorization through the patient portal. The PA immediately called the family and communicated CHCO's change in policy to Caden's father. The PA informed Caden and his family that CHCO had decided it would no longer provide medically necessary surgeries to treat gender dysphoria, effective immediately, and that they could not schedule Caden's procedure.

65. The physician's assistant stated that although Caden was an established patient in the practice, the practice's pediatric surgeons were now prohibited from completing his surgery.

66. The physician's assistant expressed regret that they "unfortunately ha[d] not been given any further information to answer critical questions regarding any reasoning behind this executive decision."

67. Caden had been receiving treatment for his gender dysphoria at the TRUE Center for 20 months and had been consulting and preparing with CHCO for top surgery for 8 months when his family was told he could not move forward with the procedure because of the Hospital's decision. Caden and his family were crushed.

68. As a result of CHCO's denial of care, Caden continues to experience the symptoms of untreated gender dysphoria, including significant distress, anxiety, and withdrawal.

69. The denial of care also caused Caden to experience feelings of hopelessness. He felt like he and his family had worked for a year for nothing. He experienced heightened anxiety not knowing whether he would be able to get the procedure before leaving for college in the fall. He had dreamt that he would be able to start school with greater comfort in his body; that he could present himself to his classmates as his authentic self; and that he could make new friends without worrying about his gender being misperceived. His mental health became weighed down with worry, fear, and loss at the thought of his dysphoria defining the beginning of the next chapter of his life.

70. Caden's family made every effort to establish care with another provider who was qualified to perform the surgery, accepted insurance for the procedure, and could schedule it in time for Caden to recover at home, before leaving for college in the fall. Waiting times and the significant delay associated with having to restart the consultation process made that impossible.

71. Caden's family will now have to pay for the surgery out-of-pocket in order for him to complete post-operative recovery before he leaves for college in the fall.

72. On July 18, 2023, The Denver Post broke the story about CHCO's abrupt adoption of its discriminatory bar on providing medically necessary surgeries to transgender patients to treat gender dysphoria.

73. Caden brings this case to hold CHCO accountable for denying him care and for its discriminatory refusal to provide essential medical care to transgender young people.

## CLAIMS FOR RELIEF

## FIRST CLAIM

**Discrimination in a Place of Public Accommodation Based on Disability in Violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-601 et seq. & § 24-34-802**

74. All paragraphs in this Complaint are incorporated herein by reference.

75. CADA prohibits discrimination in a place of public accommodation against any person on the basis of disability. C.R.S. § 24-34-601(2)(a). It is a discriminatory act "directly or indirectly, to refuse, withhold from, or deny to an individual or a group the full and equal

9

enjoyment of" a public accommodation's "goods, services, facilities, privileges, advantages, or accommodations." *Id.*

76. Under CADA, an individual with a disability also must not, by reason of the individual's disability, be excluded from participation in or be denied the benefits of services, programs, or activities provided by a place of public accommodation. C.R.S. § 24-34-802(1)(b).

77. Plaintiff has a diagnosis of gender dysphoria, which significantly limits one or more of his major life activities. Plaintiff is an individual with a disability as defined in C.R.S. § 24-34-301(7).

78. CHCO categorically excludes people from accessing medically necessary surgeries when sought to treat gender dysphoria but does not exclude people from accessing the same or substantially similar procedures when sought for other reasons.

79. CHCO categorically excludes people from accessing medically necessary surgeries—that it has the expertise and capacity to provide—because they experience gender dysphoria.

80. CHCO's abrupt adoption of the categorical exclusion policy and the attendant termination of care for transgender patients in the pipeline to receive medically necessary surgery failed to comply with CHCO's usual adult care transition practice.

81. CHCO applied its categorical exclusion to bar Plaintiff from participation in services and denied him the benefits of those services on the basis of his gender dysphoria.

82. By terminating Plaintiff's care in violation of CHCO's usual adult care transition practices as a result of the exclusionary policy, CHCO denied Plaintiff "full and equal" access to its services on the basis of gender dysphoria.

## SECOND CLAIM

**Discrimination in a Place of Public Accommodation Based on Sex, Gender Identity, and Gender Expression in Violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-601 et seq.**

83. All paragraphs in this Complaint are incorporated herein by reference.

84. Under CADA, it is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation because of sex, gender identity, or gender expression. C.R.S. § 24-34-601(2)(a).

85. Gender dysphoria is a medical condition unique to transgender people, i.e. individuals whose gender identity does not conform to the sex they were assigned at birth. It is characterized by clinically significant distress arising from the incongruence between a person's gender identity and assigned sex at birth. Medically necessary surgeries for the treatment of gender dysphoria alleviate that dysphoria by aligning a person's physical sex characteristics with their gender identity.

86. CHCO categorically refuses to provide medically necessary care for the treatment of a condition unique to people whose gender identity does not align with their sex assigned at birth. CHCO continues to offer the same or substantially similar procedures to patients whose gender identity aligns with their sex assigned at birth.

87. CHCO categorically refuses to provide medically necessary surgeries that align a patient's secondary sex characteristics with their gender identity if the patient's gender identity is different from the patient's sex assigned at birth. CHCO continues to offer the same or substantially similar procedures that align a patient's secondary sex characteristics with their gender identity if the patient's gender identity is the same as the patient's sex assigned at birth.

88. CHCO denied Plaintiff medically necessary surgery to align his secondary sex characteristics with his gender identity under a policy that applies only to transgender patients.

89. CHCO applied its categorical exclusion to bar Plaintiff from participation in services and denied him the benefits of those services on the basis of his sex, gender identity, and gender expression.

90. By terminating Plaintiff's care in violation of CHCO's usual continuum of care practices as a result of the exclusionary policy, CHCO denied Plaintiff "full and equal" access to its services on the basis of his sex, gender identity, and gender expression.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

   a. an order finding that CHCO discriminated against Plaintiff on the basis of his sex, gender identity, gender expression, and disability;

   b. an injunction and order requiring CHCO's compliance with CADA;

   c. for CHCO's discrimination on the basis of disability, an award of the statutory fine of three thousand five hundred dollars or actual monetary damages;

d. for CHCO's discrimination on the basis of sex, an award of the maximum statutory fine of five hundred dollars;

e. for CHCO's discrimination on the basis of gender identity, an award of the maximum statutory fine of five hundred dollars;

f. for CHCO's discrimination on the basis of gender expression, an award of the maximum statutory fine of five hundred dollars;

g. an award of reasonable attorney fees and costs;

h. an award of pre- and post-judgment interest; and

i. any other and further relief this Court deems just and proper.

Respectfully submitted this 14th day of February, 2024.

**WILMER CUTLER PICKERING HALE AND DORR LLP**

**By:** */s/ Mary (Mindy) V. Sooter*
Mary (Mindy) V. Sooter, #35136
Arielle K. Herzberg, #54234
Phillip R. Takhar, #54253

Timothy R. Macdonald, #29180
Sara R. Neel, #36904
Emma Mclean-Riggs, #51307
Anna I. Kurtz, #51525
American Civil Liberties Union Foundation of Colorado

***Attorneys for Plaintiff***

*Original signatures on file at the offices of WilmerHale pursuant to C.R.C.P. 121 §1-26(7).*